# IN THE SUPREME COURT, STATE OF WYOMING

# 2014 WY 30

## OCTOBER TERM, A.D. 2013

## February 25, 2013

BRIAN J. NOEL,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-13-0059

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Robert T. Moxley, Cheyenne, Wyoming.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne Martens, Assistant Attorney General.  Argument by Ms. Martens.

**Before KITE, C.J., and HILL, BURKE, and FOX, JJ., and DONNELL, D.J.**

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**DONNELL, District Judge.**

[¶1]   Pursuant to a plea agreement, Brian J. Noel pleaded guilty to two counts of attempted voluntary manslaughter. His pleas were accepted, and Noel was sentenced to two consecutive terms of incarceration of seventeen to twenty years. Noel now challenges on several grounds the plea agreement and the validity of his guilty pleas, as well as the sentences imposed. Finding no error, we affirm.

## ISSUES

[¶2]   In his original *Brief of Appellant*, Noel presented the following sole issue for review:

1.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY FAILING TO CONSIDER MITIGATING SENTENCING EVIDENCE AND BY APPLYING THAT EVIDENCE TO THE WRONG CRIME, THEREBY DEPRIVING BRIAN NOEL OF HIS PLEA BARGAIN?

However, Noel replaced his appellate counsel and in a subsequent *Supplemental Brief of Appellant*, he expanded his issues to include:

1. CAN A PLEA AGREEMENT BE VALID UNDER W.R.Cr.P. RULE 11(e), WHEREBY A CRIMINAL DEFENDANT MUST "RECOMMEND" CONSECUTIVE PRISON SENTENCES, WITHOUT ANY SENTENCING CONCESSION FROM THE STATE?

2. DID A LEGALLY SUFFICIENT FACTUAL OR LEGAL BASIS SUPPORT THE TRIAL COURT'S ACCEPTANCE OF GUILTY PLEAS TO "ATTEMPTED VOLUNTARY MANSLAUGHTER," AND WAS THAT CRIME LOGICALLY POSSIBLE IN THIS CASE?

3. WAS THE SENTENCING ON REDUCED CHARGES RENDERED UNFAIR BY THE TRIAL COURT'S RESTRICTIVE INTERPRETATION OF THE PLEA AGREEMENT, BY THE STATE'S POSITION THAT BRIAN NOEL ACTED WITH THE INTENT TO KILL, AND BY VICTIM IMPACT EVIDENCE THAT PORTRAYED HIM AS GUILTY OF ATTEMPTED MURDER?

1

4. DID THE SUBSTITUTE SENTENCING COURT ABUSE ITS DISCRETION OR ACT CONTRARY TO LAW IN THE PROCESS OF SENTENCING MR. NOEL TO NEAR-MAXIMUM, CONSECUTIVE SENTENCES?

Finally, in his *Reply Brief of Appellant*, apparently acting on the theory that "more is better," Noel added even more issues, stating them as:

1. WAS THE PLEA-TAKING COLLOQUY SUFFICIENT TO ASSURE THAT A "WAIVER OF APPEAL" IS ENFORCEABLE?

2. ARE THE TERMS OF A PLEA BARGAIN AND THE TRIAL COURT'S INTERPRETATION OF THE BARGAIN SUBJECT TO *DE NOVO* REVIEW?

3. DOES "PLAIN ERROR" DOCTRINE ALLOW THE COURT TO DISREGARD CONSTITUTIONAL DEFECTS IN THE ACCEPTANCE BELOW OF NOEL'S PLEA?

4. DOES *STARE DECISIS* FORECLOSE NOEL'S CHALLENGE TO HIS CONVICTION BELOW FOR A LOGICALLY IMPOSSIBLE CRIME?

[¶3] The State presents the following synopsis of the relevant issues:

I. For a guilty plea to waive all non-jurisdictional defenses, it must be voluntary, intelligent, and supported by a sufficient factual basis. When questioned by the district court, Noel asserted that he understood the entirety of the plea-taking proceedings and his plea agreement and that he sought to plead guilty voluntarily. Evidence that supported each element of the crime was presented to the district court. Did the district court properly accept Noel's guilty pleas so that he waived any non-jurisdictional defenses that he may have had?

II. Before exercising their sentencing discretion district courts may consider a wide variety of information about offenders and their crimes. The district court received and considered detailed evidence about the circumstances of Noel's crimes, evidence about his good character, and victim impact statements. Did the district court err by sentencing Noel in accordance with the terms of the plea agreement and within the range provided by statute?

2

## BACKGROUND FACTS

[¶4]   On November 9, 2011, Noel, severely depressed and under the influence of alcohol, decided to commit suicide.  He took a Ruger nine-millimeter handgun from his parents' home and checked into a room at the Fairfield Inn-Marriott in Cheyenne, Wyoming.

[¶5]   Laramie County Sheriff's Deputies Chance Walkma and Mark Yocum subsequently responded to a call from Noel's parents that their son was suicidal and seeking assistance in locating Noel for a welfare check.  The deputies learned that two handguns were missing from the Noel home and that Noel's parents were concerned that Noel might harm himself.  Deputies Walkma and Yocum successfully tracked Noel to his hotel room and knocked on Noel's door.

[¶6]   Noel responded to the knock, armed with the fully loaded handgun in his right hand and using his left hand to open the door, thereby concealing the right side of his body.  Upon making contact with Noel, the deputies informed him of their purpose and asked Noel to come out into the hallway to speak with them.  Noel replied with profanity.  Suspecting that Noel was armed, the deputies commanded Noel to drop his gun but Noel refused.  Deputy Walkma then utilized his Taser on Noel's left arm, with no apparent effect.  Instead, Noel fired fifteen rounds in the direction of the deputies, emptying the gun of all of its ammunition and firing while he retreated into the hotel bedroom.[1]  One of those bullets, likely the first one, struck Deputy Walkma, entering his abdomen and exiting near his spine.  Noel then surrendered himself, shouting, "I'm done; I'm done. I'm out; I'm out."

## PROCEDURAL HISTORY

[¶7]   On November 9, 2011, Noel was charged with two counts of attempted second-degree murder pursuant to Wyo. Stat. Ann. §§ 6-2-104 and 6-1-301(a) (LexisNexis 2013).  On July 3, 2012, a written plea agreement and Amended Information were filed with the District Court, amending Noel's charges to two counts of attempted voluntary manslaughter pursuant to Wyo. Stat. Ann. §§ 6-2-105(a)(i) (LexisNexis 2003) and 6-1-301(a).

## I.   The Plea Agreement

---

[1] Noel later asserted that at least his initial shots were fired involuntarily as he was "falling" from the impact of the Taser.  He conceded, however, that he continued to fire his gun in the direction of the deputies even after he was retreating from the area of the hotel doorway.  Noel continues to assert, in his appellate briefs, that he fell backwards, shocked by the electrical volts from the Taser, and reflexively fired the gun fifteen times.

3

[¶8]    Pursuant to the plea agreement between the State and Noel and in exchange for the amendment of charges, Noel agreed to a joint sentencing recommendation pursuant to W.R.Cr.P. 11(e)(1)(B).  The agreement provided for a sentencing range of five-and-one-half years to twenty years of incarceration per count, to run consecutively.  The plea agreement further specified that Noel could argue for the minimum of this agreed-upon sentencing range, while the State was free to argue for the maximum sentence within this range.  The plea agreement recognized that the sentencing recommendations were not binding upon the District Court, which had the power to sentence Noel to the maximum penalties provided by law.  Noel also expressly waived his right to appeal any charges, including any defects in the charging documents as well as any terms or conditions expressly stated as part of the plea agreement.

## II.    The Plea Taking

[¶9]    On June 28, 2012, Noel appeared before the District Court to enter his change of plea, at which time he was re-arraigned on the amended charges.  Defense counsel and the prosecutor explained to the court the terms of the written plea agreement, stating:

> Mr. Noel understands this is a recommended plea agreement, first of all, which means the Court is not bound by any of the terms of the plea agreement.
>
> Mr. Noel will plead to both counts, attempted manslaughter. The agreement goes on to state that the defendant is free to argue for any sentence, so long as it's not less than five and a half years and no more than 20 and - - on both counts; and that that argument will include a recommendation for consecutive terms.
>
> Both parties are free to argue from any police reports and law enforcement reports and the law.  I will let the Court know now - - seems like a good time to say it - - the parties anticipate a sentencing in this matter that may run all day. . . .
>
> Other than that, Your Honor, that's pretty much the meat of the agreement.  He will also give a factual basis, of course, that will comply with the two counts in the Amended Information.
>
> . . .
>
> The State is free to argue up to the maximum sentence on each count to run consecutively.

4

[¶10] The District Court then confirmed with Noel that he understood the agreement, verifying that Noel had signed the plea agreement and confirming that Noel entered the agreement voluntarily. Noel pleaded guilty to both amended charges, and the court asked Noel to provide a factual basis for his pleas, in response to which Noel testified, in pertinent part:

> I proceeded to the door to answer it with the 9-millimeter handgun in my right hand, which was loaded with a round in the chamber, fully loaded.
>
> . . . .
>
> I remember seeing what appeared to be a green laser pointer. I remember feeling excruciating pain and shots.
>
> I - - it happened extremely quick. The only thing I really remember from the point of getting - - I actually had been Tased - - that's not what I thought initially though - - was I was falling backwards. I was shooting a gun in the direction of the two sheriff's deputies.
>
> I believe that I had fired around five to seven shots hitting the ground. My first conscious thought was, oh, my God. I threw the gun away. I yelled out to the deputies that I was done, that I was over. It happened so fast that it just didn't seem real. I couldn't believe what had happened.
>
> . . . .
>
> THE COURT: All right. Are you telling me that you get Tased, and you sort of fall backwards, and then the firearm goes off; or was it discharged while you recall still standing?
>
> THE DEFENDANT: From what I remember is from when I got hit, that yes, it discharged and went off, is what I remember. I believe evidence would show otherwise. Although from my memory, all I remember is excruciating pain from the Taser. . . . I remember falling backwards and firing the gun. It just happened so quickly, Your Honor. I wish I could explain more of the exact details that had

5

happened in that short period of time. You know, 15 [shots] were fired, and one of the deputies was hit.

. . . .

THE COURT: I think what you told me, if I'm following what you've said, is you weren't' really trying to kill either Deputy [Walkma] or Deputy Yocum. It is just that when you got Tased, something happened to cause you to pull the trigger; and the gun discharged.

THE DEFENDANT: That's correct, Your Honor.

. . . .

THE DEFENDANT: I guess what maybe I ought to explain is that, you know, initially when I had been Tased, there was absolutely no intent whatsoever. Although firing 15 rounds when I was falling back, I did fire the gun in the direction of the deputies, which I believe - - you know, it's hard for me to think that I would have done that. But it does seem to show that I had intent to harm or kill the deputies when I fired back in their direction.

There's something that happened in my mind that, you know, it just - - it happened very quickly. I don't - - I just don't like to think that I could - - you know, if it were one or two rounds, that would make sense that it were accidental, but 15 I think shows intent to kill.

[PUBLIC DEFENDER]: Your Honor, if I may? The evidence would show that there were 14 bullet holes on Mr. Noel's side of the door. There were 15 rounds fired. It is our belief that probably the first round is the one that hit Officer [Walkma], while Officer [Walkma's] police statement is that the gun had cleared the door at the time that he saw a flash. So I think that would corroborate that.

There are four more bullets that are - - as the door was being pushed open or pulled open, I don't know which - - but they're at a very severe steep angle to the door. But they are all head high, and they're contact shots. The muzzle of the gun was clearly against the door, the door - - the hotel door.

6

So it has an automatic closure. So when Officer - - or Deputy [Walkma] and Yocum went in opposite directions, the door was closing at that point.

After that, Mr. Noel continued to fire through the door. And I think the State would be able to prove logically that the main pattern is in the middle of the door. But there are also bullet holes going off in the different angles which would indicate - - I think at trial they could make a pretty good argument that as the officers were running, he was aiming through the wall and through the door. That - - at that point, I don't think there's any doubt, even if the person was - - a complete accident - - that's one that Mr. Noel really can't remember because he was being Tased at the time. I think he was in surprise.

But after that, then the continuation I think is what the State and the Defense have agreed would be voluntary - - attempted voluntary manslaughter. So I don't think the first bullet really matters that much, other than I think that's the one that hit Deputy [Walkma], unfortunately.

So I think the remainder, even if - - and I think we can count that one. But even if we don't, we still have 14 bullets shot.

. . .

And just one more thing. If the Court is struggling with a factual basis, I would point out that the jury instruction states that the heat of passion is when an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation. And I think that's exactly what the facts given to the Court show. He acted rashly, without reflection, without deliberation, and continued through the process of emptying the clip.

. . .

[PROSECUTING ATTORNEY]: . . . The State would also like to add that when the deputies knocked on the door, Mr. Noel answered. They were commanding him to drop his gun. They were yelling at him over and over again. And at one

7

point, he said "Fuck you." They continued to yell at him. And finally, they had to Tase him. He was angry with the officers - - of with the deputies from the beginning of the incident. He wanted them to go away. He would not comply. They continued to yell, and then he was Tased. And, Your Honor, that - - all of those factors together I think shows the heat of passion.

Additionally, at this point, I think it's important to note that law enforcement did not return fire. And the evidence would indicate that Mr. Noel was firing shots in the direction of both deputies, which again I think shows intent. And also, the evidence would show he was not falling backwards, but he was actually retreating into the room to protect himself, to get cover in case they did fire back.

The District Court ultimately concluded that Noel was competent to enter his guilty pleas, which were knowingly and voluntarily made with a full understanding of the consequences. The court accepted the pleas "under the *Alford* and *Berry* lines of cases," determining that the State could have proven the elements of the crimes charged beyond a reasonable doubt.

## III.    The Sentencing

[¶11] On January 22, 2013, Noel appeared before the District Court for sentencing, at which time both parties presented information that detailed the circumstances of Noel's crime. The State presented evidence regarding Noel's location when firing the fifteen rounds as well as testimony on the likely effect, or lack thereof, of Noel having been Tasered prior to commencing fire. The State also presented evidence regarding the various, inconsistent accounts Noel had given investigators about his conduct immediately after the shooting. Finally, Deputy Walkma and Deputy Yocum offered victim impact statements regarding the impact of the events on their lives.

[¶12] Noel presented testimony regarding his alcohol dependence, severe major depressive disorder, and post-traumatic stress disorder. Noel's expert witness indicated that, at the time of the shooting, although Noel understood that his actions were wrong, he was not able to control his behavior nor form any intent to harm. Noel also presented several witnesses to testify as to his good character.

[¶13] In rendering its decision, the District Court commented upon the relevant mitigating factors, also recognizing,

The victims are not satisfied with the plea agreement. Not

8

mine today. They survived, and counsel now urges upon me those mitigating factors presented here today, mental illness, alcohol, and so forth, and ask me to weigh this in the middle as opposed to the high end if you want to say it that way, of these kind of charged crimes.

[¶14] The court noted that, in its opinion, Noel failed to take responsibility for his conduct and that Noel remains a danger to society, stating:

The law says I'm supposed to consider those things when I consider what is a just result, but most of the mitigation you called for was established by the State's plea agreement where the minimum - - the floor of 20 years would have had to have been imposed without any choice had he been convicted.

The sentencing court ultimately sentenced Noel to a period of incarceration of seventeen to twenty years on each of the two counts, to run consecutively. This appeal followed.

## ANALYSIS

[¶15] Noel's briefs provide a large number of rather free-flowing concepts concerning the injustices he believes were visited upon him, while the State's issues are more succinctly stated. We therefore primarily consider this case in light of the issues articulated by the State.

## I. Validity of Plea Agreement

[¶16] Although the State focuses on the notion, albeit correct, that Noel waived all nonjurisdictional challenges by virtue of his guilty plea, *see Kruger v. State*, 2012 WY 2, ¶ 45, 268 P.3d 248, 257 (Wyo. 2012), it is the very validity of those guilty pleas that Noel now challenges, thus necessitating some consideration of whether the guilty pleas and plea agreement were, in fact and in law, valid.[2]

### A. Standard of Review

[¶17] Review of a plea agreement is *de novo*. *See Duke v. State*, 2009 WY 74, ¶ 9, 209 P.3d 563, 567 (Wyo. 2009); *Ford v. State*, 2003 WY 65, ¶ 8, 69 P.3d 407, 410 (Wyo. 2003).

---

[2] Because this Court necessarily must consider the validity of Noel's guilty pleas, in conjunction with the plea agreement, as part and parcel of this appeal, the issue regarding the waiver of Noel's right to appeal is moot.

## B.    Consideration of Noel's Plea Agreement

[¶18]   Simply stated, Noel agreed to plead guilty to two counts of attempted voluntary manslaughter to reduce his risk of exposure to a much longer sentence should he be convicted of two counts of attempted second-degree murder.  Originally charged as two counts of attempted second-degree murder pursuant to Wyo. Stat. Ann. §§ 6-2-104 and 6-1-301(a), Noel faced mandatory imprisonment of "not less than twenty years" on each count and the possibility of consecutive life sentences, *see* Wyo. Stat. Ann. § 6-2-104, whereas, with his ultimate convictions for two counts of attempted voluntary manslaughter, he was exposed to a period of incarceration of "not more than twenty (20) years" on each count, *see* Wyo. Stat. Ann. § 6-2-105(b).  The District Court recognized the nature of the agreement, and confirmed as much with Noel, stating:

> THE COURT:    Would it be the case that you've decided to plead guilty to these crimes in order to avoid the more severe punishment that might come if the State tried you for attempted second-degree murder?

> THE DEFENDANT:    Yes, I do, Your Honor.

[¶19]   Yet, Noel now claims that the law does "not envision that a defendant will give up his ability to argue for probation, lock himself into a long prison sentence, and advocate unilaterally for consecutive sentences, in return for nothing more than the modest reduction of charges."  To the contrary, that is exactly what the law contemplates.  And it bears noting that the potential terms of incarceration which Noel avoided by virtue of this plea agreement were hardly "modest."

[¶20]   W.R.Cr.P. 11(e)(1) describes the possible terms of plea agreements and provides that:

> (1)    In General. – The attorney for the state and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser related offense, the attorney for the state will do any of the following:
> **(A)    Agree not to prosecute other crimes or move for dismissal of other charges;**
> (B)    Make a recommendation, or agreement not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon  the court; **or**

(C)     Agree that specific sentence is the appropriate disposition of this case.

W.R.Cr.P. 11(e)(1) (emphasis added).

[¶21]  The procedures required of Rule 11 are "well-defined." *Gibbs v. State*, 2008 WY 79, ¶ 12, 187 P.3d 862, 866 (Wyo. 2008).  Noel would have this Court declare that Rule 11 requires *all three* of the subparagraphs to apply to any given plea agreement when the plain and unambiguous language of the rule clearly provides for those parameters in the disjunctive, not conjunctive.[3]

[¶22]  Here, the State agreed with Noel to reduce his charges from attempted second-degree murder to attempted voluntary manslaughter, which comports with the requirements of Rule 11(e)(1)(A).  Nothing more was required.  Accordingly, this Court need not further consider Noel's assertions that the State *also* was required to enter into a "true" sentencing recommendation.  The State was entitled to advocate for the maximum agreed-upon punishment of twenty years per count, while Noel was entitled to advocate for the minimum of five-and-one-half.  The plea agreement was valid.

## II.     **Validity of Guilty Pleas**

### A.     **Standard of Review**

[¶23]  Because Noel did not object to the plea-taking procedure below, nor move to withdraw his guilty pleas, this Court reviews Noel's assertions of error under a plain error standard.  *See Nguyen v. State*, 2013 WY 50, ¶ 10, 299 P.3d 683, 686 (Wyo. 2013).

> Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially

---

[3] The Notes of the Advisory Committee for the 1974 Amendments to the Federal Rules of Criminal Procedure, which provide the foundation for Wyoming's comparable rules, explain:

> Subdivision [11](e)(1) is intended to make clear that there are four possible concessions that may be made in a plea agreement.  First, the charge may be reduced to a lesser charge.  Second, the attorney for the government may promise to move for dismissal of other charges.  Third, the attorney for the government may agree to recommend or not to oppose the imposition of a particular sentence.  Fourth, the attorneys for the government and the defense may agree that a given sentence is an appropriate disposition of the case.

*Id.*  Nothing in the federal rules, or the Wyoming rules, requires that *all four* of these concessions be in place for a plea agreement to be recognized as valid.

prejudiced him.

*Id.* (quoting *Kidwell v. State*, 2012 WY 91, ¶ 10, 279 P.3d 540, 543 (Wyo. 2012)). It is Noel's burden to demonstrate plain error. *See Kidwell*, ¶ 10, 279 P.3d at 543.

## B.     Consideration of Noel's Guilty Pleas

[¶24]  Noel challenges the acceptance of his guilty pleas in light of what he contends was "strong evidence" of his "actual innocence." Noel does *not* assert that he was insufficiently informed of his rights or the waiver thereof by virtue of a guilty plea, *nor* does he realistically argue that his guilty pleas were involuntary. *See generally Van Haele v. State*, 2004 WY 59, ¶ 27, 90 P.3d 708, 716 (Wyo. 2004); *Reyna v. State*, 2001 WY 105, ¶ 9, 33 P.3d 1129, 1132 (Wyo. 2001). Thus, this Court need not determine whether the trial court sufficiently described the nature of the charges, including the possible penalties; informed the defendant of his right to representation; and/or informed the defendant of the rights waived by a guilty plea. *See Sena v. State*, 2010 WY 93, ¶ 9, 233 P.3d 993, 996 (Wyo. 2010). Rather, Noel asserts that there was an insufficient factual basis, as contemplated by W.R.Cr.P. 11, of his intent to kill.[4] He asserts that he "consistently denied intent" and that the evidence undermined the factual basis provided for his pleas.[5]

[¶25]       W.R.Cr.P. 11(f) addresses the factual basis requirement and states:

> **(f) *Determining Accuracy of Plea*.** – Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

[¶26]  This Court has explained:

> The intent of the procedural requirement of a factual basis is to prevent the individual charged with a crime from being misled into a waiver of substantial rights. *Sami v. State,* 2004 WY 23, ¶ 9, 85 P.3d 1014, ¶ 9 (Wyo. 2004). A sufficient

---

[4] The "intent to kill" required for voluntary manslaughter involves an intentional act committed "upon a sudden heat of passion." *See State v. Keffer*, 860 P.2d 1118, 1138 (Wyo. 1993); Wyo. Stat. Ann. § 6-2-105(a)(i). It does not require wicked evil or unlawful purpose, or willful disregard of the rights of others. *See Keffer*, 860 P.2d at 1138-39.

[5] It is worth noting that Noel frequently relies upon "evidence" presented at his subsequent sentencing hearing. This after-the-fact evidence, would be irrelevant and, frankly, was unavailable to the district judge at the time the plea was taken.

> inquiry to obtain a factual basis includes a determination that the defendant understood his conduct, in light of the law, to be criminal. *Id.* However, the factual basis for accepting a plea may be inferred from circumstances surrounding the crime and need not be established only from the defendant's statements. *Id.* W.R.Cr.P. 11 does not require proof beyond a reasonable doubt that a defendant who pleads guilty is actually guilty nor does it require complete descriptions of the elements. *Id.*

*Maes v. State*, 2005 WY 70, ¶ 21, 114 P.3d 708, 714 (Wyo. 2005). *See also Hirsch v. State,* 2006 WY 66, ¶ 9, 135 P.3d 586, 590 (Wyo. 2006); *Sami v. State,* 2004 WY 23, ¶¶ 9-10, 85 P.3d 1014, 1017-18 (Wyo. 2004).

[¶27] The flaw with Noel's argument is that, here, the court accepted the guilty pleas not based upon Noel's presentation of a factual basis for his guilty pleas but under the *Alford* and *Berry* lines of cases, which recognize that

> An *Alford* plea is a guilty plea. *N. Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970); 5 Wayne R. LaFave, et al., Crim. Proc. § 21.4(f) (3d ed. 2007). It differs from a conventional guilty plea because the defendant denies his guilt and therefore does not supply a satisfactory basis for the plea, but instead seeks to obtain the benefit of a plea bargain to avoid a potentially harsher penalty than he might receive if he goes to trial and is convicted. *Id.* Courts considering the issue have held that an *Alford* plea has the same preclusive effect in subsequent civil litigation as an ordinary guilty plea. *Zurcher v. Bilton,* 379 S.C. 132, 136, 666 S.E.2d 224, 227 (2008); *United States v. In,* 83 Fed.R.Evid. Serv. 168 (D. Utah 2010).

*McEwan v. State*, 2013 WY 158, ¶ 15, n.4, 314 P.3d 1160, 1165 (Wyo. 2013). *See also North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); *Berry v. State*, 2004 WY 81, 93 P.3d 222 (Wyo. 2004); *Sami,* 2004 WY 23, 85 P.3d 1014; *Rude v. State*, 851 P.2d 15, 18 (Wyo. 1993).

[¶28] The existence of a bona fide defense does not prevent the entry of an Alford plea. *See Johnston v. State*, 829 P.2d 1179, 1182 (Wyo. 1992). But, "[a]cceptance of an Alford plea . . . require[s] strong evidence of actual guilt to negate the claim of innocence and provide a means by which the trial court can test whether the plea was intelligently entered. *Maes*, ¶ 21, 114 P.3d at 714 (quoting *Johnston v. State,* 829 P.2d 1179, 1181 (Wyo. 1992)).

13

[¶29] Thus, in order to accept Noel's *Alford* pleas, the trial court required sufficient evidence that substantially negated Noel's claims of innocence. In determining the sufficiency of a factual basis, a trial court may draw inferences from the defendant's admissions, the circumstances surrounding the crime, and the evidence presented by the State. *See Nguyen*, ¶ 11, 299 P.3d at 686; *Rude*, 851 P.2d at 18. As the State well noted, a sufficient factual basis from which intent may be easily and clearly inferred has been recognized in several Wyoming cases. *See Maes*, 2005 WY 70, 114 P.3d 708; *Warren v. State*, 809 P.2d 788 (Wyo. 1991).

[¶30] Here, the totality of facts and circumstances presented by the State, as conceded by Noel, were more than sufficient to justify the court's determination that, even if Noel's initial shots were caused by a reaction to the Taser, his continued firing and the discharge of a total of fifteen rounds in the direction of the law enforcement officers was intentional conduct, directed at the law enforcement officers, in a manner that a jury could well conclude evidenced an intent to kill. This is even more so given Noel's conduct in answering the hotel door armed with a handgun; responding in a verbally aggressive manner to the deputies' demands; Noel's retreat into his hotel bedroom for refuge; and the placement of the shots fired by Noel. While Noel disclaimed any memory of any intent to harm the officers, he also conceded that the facts demonstrated otherwise.

[¶31] This Court has no hesitancy in recognizing the "strong evidence of actual guilt to negate the claim of innocence," or, more accurately, amnesia. *See Maes*, ¶ 21, 114 P.3d at 714 (citing *Johnston v. State*, 829 P.2d 1179, 1181 (Wyo. 1992)). Contrary to Noel's after-the-fact assertion, nothing during the re-arraignment and change of plea procedures could be interpreted as "equivocal" with regard to the existence of Noel's requisite intent. In sum, Noel's guilty pleas, made in conjunction with a valid plea agreement and motivated by Noel's desire to limit his exposure to an even greater period of incarceration, were knowingly, voluntarily, and intelligently made by a competent defendant, with adequate advice of counsel, and there was nothing in the record that would cause this Court to question the accuracy or reliability of Noel's admission that he committed the crimes with which he was charged.

## III. Logical Impossibility of the Conviction

[¶32] Noel next contends that, even if this Court accepts the validity of his plea agreement and his guilty pleas, the law itself demands that his pleas be set aside as a logical impossibility. More specifically, Noel claims that attempted voluntary manslaughter is an impossible crime and he could not consciously "attempt" to commit a crime when he merely reacted in confused panic to the intense pain inflicted by the Taser.

### A. Standard of Review

[¶33] The argument lodged by Noel that it is "logically impossible" for a person to specifically intend to commit a form of murder which does not require specific intent to kill presents an issue of law that this Court reviews *de novo*. *See Worcester v. State*, 2001 WY 82, ¶ 13, 30 P.3d 47, 52 (Wyo. 2001).

B. **Consideration of Attempted Voluntary Manslaughter as a Logical Possibility**

[¶34] Wyoming precedent controls this issue, establishing a long history of this State's recognition of attempted voluntary manslaughter as a logically and legally possible crime. *See Landeroz v. State*, 2011 WY 168, ¶¶ 19, 267 P.3d 1075, 1080 (Wyo. 2011); *Meyers v. State*, 2007 WY 118, ¶¶ 1-3, 164 P.3d 544, 545 (Wyo. 2007); *Hernandez v. State*, 2007 WY 105, ¶¶ 45-47, 162 P.3d 472, 482-83 (Wyo. 2007); *Mattern v. State*, 2007 WY 24, ¶¶ 32-36, 151 P.3d 1116, 1130-31 (Wyo. 2007); *Maes*, ¶ 1, 114 P.3d at 709 (Wyo. 2005); *Reilly v. State*, 2002 WY 156, 55 P.3d 1295 (Wyo. 2002) (rejecting the notion that the general intent crime of second degree murder is compatible with the specific intent required for attempt);[6] *Stout v. State*, 2001 WY 114, ¶ 3, 35 P.3d 1198, 1200 (Wyo. 2001); *Bilderback v. State*, 13 P.3d 249, 251-52 (Wyo. 2000); *Knox v. State*, 848 P.2d 1354, 1356 (Wyo. 1993); *Sanchez v. State*, 841 P.2d 85, 89 (Wyo. 1992); *Warren v. State*, 809 P.2d 788 (Wyo. 1991) (recognizing the crime of attempted voluntary manslaughter); *Stice v. State*, 799 P.2d 1204, 1205 (Wyo. 1990); *Best v. State*, 736 P.2d 739, 747 (Wyo. 1987); *Shepard v. State*, 720 P.2d 904, 905 (Wyo. 1986).

[¶35] In addressing a comparable analysis, this Court stated:

> Appellant contends that the elements of an attempt and second-degree murder are mutually exclusive and/or logically impossible, because an attempt requires that one act with a specific intent, while second-degree murder only requires that one act with a general intent. . . .
>
> Wyo. Stat. Ann. § 6-1-301 states, in pertinent part:
>
> (a) A person is guilty of an attempt to commit a crime if:
>
> (i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly

---

[6] In *Reilly*, this Court concluded that "Wyoming is not a jurisdiction that finds it 'logically impossible' to attempt a general intent crime." *Id.*, ¶ 10, p. 1263.

corroborative of the firmness of the person's intention to complete the commission of the crime[.]

According to Wyo. Stat. Ann. § 6-2-104, "[w]hoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree. . . ."

Appellant's claimed "logical impossibility" arises from the "intent" elements of these respective statutes. In the past, crimes have commonly been categorized by whether they require a "specific intent" or a "general intent." For many years, Wyoming had several pattern jury instructions defining and explaining the two terms, and yet, the differences between the concepts were not always readily discernible.

Realizing that the distinction between a specific intent crime and a general intent crime is apparently troublesome, we can perhaps clarify it by stating it in a somewhat different way. When the statute sets out the offense with only a description of the particular unlawful act, without reference to intent to do a further act or achieve a future consequence, the trial judge asks the jury whether the defendant intended to do the outlawed act. Such intention is general intent. When the statutory definition of the crime refers to an intent to do some further act or attain some additional consequence, the offense is considered to be a specific intent crime and then that question must be asked of the jury.

*Dorador v. State,* 573 P.2d 839, 843 (Wyo. 1978). Following that logic, an "attempt" is a "specific intent" crime in that the attempt statute requires that one act with the intent to commit the object crime. On the other hand, we have held that second-degree murder is a general intent crime, because it requires proof only that the act was done voluntarily or deliberately, not that there was a specific intent to kill. *Bouwkamp v. State,* 833 P.2d 486, 493 (Wyo. 1992); *Ramos v. State,* 806 P.2d 822, 830 (Wyo. 1991).

. . . .

**Our precedent reveals that Wyoming is not a jurisdiction that finds it "logically impossible" to attempt a general**

16

**intent crime**.  In several opinions, we have affirmed attempted second-degree murder convictions.  *See, e.g., Bilderback v. State,* 13 P.3d 249 (Wyo. 2000); *Gabriel v. State,* 925 P.2d 234 (Wyo. 1996); and *Dichard v. State,* 844 P.2d 484 (Wyo. 1992).  **We have also previously recognized the crime of attempted voluntary manslaughter**.  *Warren v. State,* 809 P.2d 788 (Wyo. 1991). Wyo. Stat. Ann. § 6-2-105(a) (LexisNexis 2001) provides, in pertinent part:

A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:

(i) Voluntarily, upon a sudden heat of passion[.]

In *Warren,* 809 P.2d at 790, Warren challenged the sufficiency of the evidence to convict him of attempted voluntary manslaughter, arguing that there was no evidence of an attempt to kill.  After stating the substantive elements of attempted voluntary manslaughter, this Court proceeded to evaluate the sufficiency of the evidence as to those elements, primarily the evidence supporting Warren's "attempt" to kill his victim and the accompanying inference regarding Warren's intent.  *Id.*  We concluded that the reasonable inference from the evidence presented was that "Warren attempted to kill [his victim], and a jury could so find beyond a reasonable doubt."  *Id.*  **In the context of appellant's claimed "logical impossibility," particularly the intent element of an attempt versus that of an underlying general intent crime, attempted second-degree murder is indistinguishable from attempted voluntary manslaughter**.  Indeed, voluntary manslaughter is a "lesser included offense of the crime of second degree murder," and is "a general intent crime that does not require a deliberate intent to kill."  *State v. Keffer,* 860 P.2d 1118, 1138-39 (Wyo. 1993).

. . . .

**Nothing about the instant case convinces us that we should now find it legally or logically impossible for a person to attempt a general intent crime**.  As we said in *Compton,* 931 P.2d at 940, 941 (*quoting People v. Frysig,* 628 P.2d 1004, 1007 n. 4, 1008 (Colo. 1981)), the question

17

presented to the jury in an attempt case essentially has two levels: (1) whether the person had " 'the intent to perform acts which, if completed, would constitute the underlying offense' "- in other words, did the person intend the conduct that constitutes the substantial step; and (2) whether the person had the intent necessary as an element of the underlying offense—" '[e]xcept for the intentional conduct constituting the substantial step, the requisite culpability is that provided for in the definition of the [underlying] offense.' " That analysis works just as well for attempted crimes that traditionally have been categorized as general intent crimes as it does for attempted crimes that traditionally have been categorized as specific intent crimes.

> *Id.,* ¶¶ 6-12; 55 P.3d at 1261-63 (footnote omitted).

*Bloomfield v. State*, 2010 WY 97, ¶ 13, 234 P.3d 366, 371-73 (Wyo. 2010) (emphasis added).

[¶36] Noel seeks to distinguish this precedent, asserting that the issue herein is different, in that it involves the *particular form* of "voluntary manslaughter." What Noel's argument really boils down to is his assertion that the district court should have concluded that Noel lacked intent, thereby invalidating any guilty plea for either Noel's original charges or his amended charges. However the court was under no obligation to draw such a conclusion, particularly in light of the totality of evidence presented to it, nor has Noel provided this Court with legal or factual support to deviate from its precedent. The Court declines to accept his invitation to do so.

## IV. Validity of Noel's Sentence

[¶37] Finally, Noel challenges the sentence imposed upon him by the sentencing court, asserting that the court failed to consider the mitigating evidence before it.

### A. Standard of Review

[¶38] Generally speaking, this Court reviews a district court's sentencing decision for an abuse of discretion. *See Magnus v. State*, 2013 WY 13, ¶ 24, 293 P.3d 459, 467-68 (Wyo. 2013). The standard of review for the reasonableness of a sentence has been more particularly described as:

> When a criminal sentence is within the parameters set by the legislature, as it is here, that sentence will not be overturned on appeal absent a clear abuse of discretion. Dodge v. State,

18

> 951 P.2d 383, 385 (Wyo. 1997). An abuse of discretion does not occur unless a court has acted in a manner which exceeds the bounds of reason under the circumstances. *Vaughn v. State*, 962 P.2d 149, 152 (Wyo. 1998). The ultimate issue is whether or not the court could have reasonably concluded as it did. *Id*. In evaluating the reasonableness of a criminal sentence, we give consideration to the crime and its circumstances along with the character of the defendant. *Dodge*, 951 P.2d at 385.

*Suval v. State*, 6 P.3d 1272, 1274 (Wyo. 2000).

[¶39] Thus, a "sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Id.* (quoting *Joreski v. State*, 2012 WY 143, ¶ 13, 288 P.3d 413, 416-17 (Wyo. 2012)). Noel carries the burden of demonstrating that he was prejudiced and his substantial right was affected by any error. *Id. See also Bitz v. State,* 2003 WY 140, ¶ 7, 78 P.3d 257, 259 (Wyo. 2003).

[¶40] However, because Noel failed to object during the sentencing hearing, the review of claimed error is limited to a search for plain error:

> First, the record must be clear as to the incident which is alleged as error. Second, the party claiming the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove a substantial right has been denied him and, as a result, he has been materially prejudiced.

*Meyers,* ¶ 16, 124 P.3d at 716 (quoting *Wilks v. State,* 2002 WY 100, ¶ 7, 49 P.3d 975, 981 (Wyo. 2002)).

## B.    Consideration of Noel's Sentences

[¶41] Noel complains that his sentence was not illegal but simply unfair. He takes issue with the villainous manner in which he was portrayed at the sentencing hearing and argues that the sentencing court failed to consider the mitigating circumstances Noel presented in favor of a lesser sentence.

[¶42] In devising a sentence for the conviction of a crime, a court must consider a number of factors. "The judge in exercising his judicial discretion should give consideration to all circumstances – aggravating as well as mitigating." *Cavanaugh v.*

19

*State*, 505 P.2d 311, 312 (Wyo. 1973). The court must consider the crime, its attendant circumstances, and the character of the defendant when assessing as reasonable sentence to be imposed. *See Frederick v. State*, 2007 WY 27, ¶ 32, 151 P.3d 1136, 1146 (Wyo. 2007). The sentencing court also is at liberty to consider the defendant's character, cooperation with authorities, and remorse for his crimes. *See Kovach v. State*, 2013 WY 46, ¶ 114, 299 P.3d 97, 128 (Wyo. 2013). Finally, a sentencing court may consider evidence that supports a charge greater than the conviction for which the defendant is being sentenced as well as evidence of other crimes committed by the defendant. *See Frederick,* ¶¶ 23-28, 151 P.3d at 1143-45; *Mehring v. State,* 860 P.2d 1101, 1117 (Wyo. 1993). That said, appropriate limits are imposed upon the information presented to a sentencing court in that the court must be presented with, and must make a decision based upon, accurate information. *See Schaeffer v. State*, 2012 WY 9, ¶ 51, 268 P.3d 1045, 1061 (Wyo. 2012). Likewise, a prosecutor must abide by the terms of any applicable plea agreement. *See Frederick v. State*, 2007 WY 27, ¶ 13, 151 P.3d 1136, 1141 (Wyo. 2007). Even still, a presumption exists that the court will not be misled or confused by irrelevant or immaterial evidence or arguments. *See Manes v. State*, 2004 WY 70, ¶ 14, 92 P.3d 289, 293-94 (Wyo. 2004).

[¶43] Here, the District Court imposed a period of incarceration of seventeen to twenty years for each of Noel's two convictions for attempted voluntary manslaughter, to run consecutively. The court imposed these sentences *after* receiving and considering a presentence investigation report that indicated that Noel had no criminal history and recommended substance abuse treatment, twelve citizen letters attesting to Noel's character, and a thirteenth letter from a suicide prevention advocate who urged the court to provide treatment for Noel. The Court imposed these sentences *after* it read the victim impact statements[7] of Deputies Walkma and Yocum who indicated the devastating impact of the event on their lives. Finally, the Court imposed these sentences *after* it considered the report of the State's medical examiner, who expressed an opinion that Noel should continue to receive therapy and counseling but expressed concern about the lack of appropriate resources "within the community for this type of offense."

[¶44] Further, at the lengthy sentencing hearing, the court heard and considered expert testimony that criticized the lack of a Taser policy at the Laramie County Sheriff's Office and was critical of the deputies' treatment of Noel for his failure to obey verbal commands. The court was presented with expert psychiatric testimony that indicated that Noel was confused and slow in processing the events of the day, perhaps "disassociating" with reality. The psychiatrist testified that, at the time of the shooting, Noel did not have the ability to control his behavior and, given the effects of his intoxication and depression, was not able to formulate any intent to harm. The court was presented with

---

[7] Wyoming law allows identifiable victims to a crime to submit a victim impact statement and commands its consideration among the factors in determining an appropriate sentence. *See* Wyo. Stat. Ann. § 7-21-103(a),(b).

20

the testimony of numerous laypersons who testified to Noel's good character, generous personality, strong work ethic, and initiative. Finally, Noel presented his own statements, during which he chronicled his life and struggles with alcoholism and depression, finally culminating on the night of November 9, 2011, about which he asserted he "had absolutely no intention of harming anybody . . . except for myself."

[¶45] However, the sentencing court also heard and considered testimony that countered much of what Noel presented, including varying accounts of the shooting that Noel told law enforcement officers during his interview and that Noel had not exhibited signs of intoxication during the post-shooting interview that occurred less than three hours after the incident. The court heard the victim impact statements of Deputy Walkma, including his dismay at the plea agreement and his belief that Noel had been afforded undue leniency. Deputy Walkma recounted the events of the night of November 9, 2011, indicating that Noel had been "enraged" at the deputies and unaffected by the Taser. Deputy Walkma firmly believed that Noel had planned to kill him and Deputy Yocum. He expressed the long-term impact of the event on his life, including his struggles with anxiety, depression, and post-traumatic stress. Deputy Yocum's testimony largely mirrored that of Deputy Walkma's insofar as his disapproval of the plea agreement and his disbelief of the defense expert opinions regarding Noel's inability to form any intent to kill.[8]

[¶46] In light of all this evidence, Noel relies upon the mitigating factors presented by his lack of criminal record; his history of mental illness and intoxication at the time of the crime; the potential impact of the Tasering on his actions; and multiple character references, to assert that the sentence imposed by the court was improper. Noel takes particular issue with the sentencing court's consideration of the crimes with which he *could have been* charged. More specifically, the court commented upon the nature of the plea agreement, noting that Noel had received the benefit of a reduction in the maximum sentence by virtue of the amendment of the charges. And, while the court remarked that "most of the mitigation you called for was established by the State's plea agreement where the minimum - - the floor of 20 years would have had to have been imposed without any choice had he been convicted." Noel asserts that this single comment, taken out of the context establishes that the court applied the mitigating factors to Noel's *original* charges. We disagree.

[¶47] It is true that Noel received the benefit of a necessarily reduced maximum

---

[8] As noted, the deputies were permitted to provide victim impact statements, which elaborated on the physical, psychological, and emotional harm they suffered, as well as their thoughts on the appropriate disposition of the case. *See* Wyo. Stat. Ann. § 7-21-105(c). And, to the extent the deputies expressed their dissatisfaction with the plea agreement and their opinions that Noel should receive a more severe sentence than that for which he had bargained, the sentencing court expressly noted that it did not consider such remarks in rendering Noel's sentence.

21

sentence by virtue of his plea agreement, but the court's commentary on such did not negate the court's extensive recognition of the various aggravating and mitigating factors that it heard, and considered, during the lengthy sentencing hearing on January 22, 2013. The court recognized as much, stating: "It's about mitigation as against the possible sentences available to me." But, ultimately, the court discredited Noel's lack of recollection, opining: "[N]obody pulls a trigger, 15 rounds, until it's empty, recognizes that it's empty, and speaks up to protect himself, which is what he did, in my view." This conclusion applies equally to Noel's argument that the sentencing court's failure to orally recognize Noel's lack of prior criminal history equates to a conclusion that the court "fail[ed] to consider . . . that remarkable factor."[9] The record does not support such a conclusion.

[¶48] Noel continues to minimize the gravity of his conduct, but this Court cannot: Noel fired fifteen bullets in the direction of two law enforcement officers in a display of conduct that cannot belie his intent to kill. While Noel's lack of prior criminal history, reports of his good character, alcohol dependence and abuse at the time of the crimes, and history of mental health issues certainly were valid considerations in determining the reasonableness and proportionality of an appropriate sentence, so, too, were the aggravating factors presented by the prosecutor and the seriousness of Noel's conduct

[¶49] Clearly and simply, a defendant must be sentenced on the basis of "accurate information." *Manes*, ¶ 9, 92 P.3d at 292. Although subject to debate and issues of credibility, nothing in the information presented to the sentencing court was necessarily inaccurate. Noel debates the information presented that was prejudicial to his position, arguing that it "cannot be regarded as reliable," but he cannot and does not provide support for such assertions. The sentencing court was equally as able to conclude that Noel was unaffected by the Taser; developed an intent to kill the deputies; and acted thereon as it was able to conclude otherwise. This Court finds no error with the sentencing court's application of the law or in the ultimate sentences imposed upon Noel.

## CONCLUSION

[¶50] For the reasons set forth herein, this Court concludes that the district court did not err in accepting Noel's guilty pleas to two counts of attempted voluntary manslaughter in exchange for the plea agreement nor did the court err in sentencing Noel to two consecutive counts of seventeen to twenty years of incarceration thereon. Noel's convictions and sentences are affirmed in all respects.

---

[9] To the extent that Noel argues that the prosecutor strayed outside the bounds of the plea agreement or made improper arguments before the sentencing court, his argument warrants no more than a footnote to recognize its lack of merit.

22