# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 46

OCTOBER TERM, A.D. 2014

March 26, 2015

SHEY ELAN BRUCE,

Appellant
(Defendant),

v.

S-14-0138

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Fremont County*
*The Honorable Norman E. Young, Judge*

*Representing Appellant:*
Office of the State Public Defender:  Diane Lozano, State Public Defender; and Tina N. Olson, Chief Appellate Counsel.  Argument by Ms. Olson.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; and Mackenzie Williams, Senior Assistant Attorney General.  Argument by Mr. Williams.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1] A jury convicted Appellant Shey Bruce of manslaughter and battery of a household member. Mr. Bruce appeals his manslaughter conviction, claiming that the district court erred in denying his motion for judgment of acquittal in relation to the charge of second degree murder and his post-trial motion for judgment of acquittal in relation to the manslaughter conviction. He also alleges error in the district court's denial of his motion for new trial, its refusal to instruct the jury on his claim of self defense, and its admission of the deceased victim's 911 call. We affirm.

## ISSUES

[¶2] Mr. Bruce states the issues on appeal as follows:

> I. Did the trial court err in denying the motions for judgment of acquittal with regard to the charge of second degree murder and in denying the motion for judgment of acquittal, post-trial, of Appellant's conviction of manslaughter?
> II. Did the trial court err in denying Appellant's motion for new trial, based upon undisclosed statements of the deceased, which the jury heard?
> III. Did the trial court err in refusing to instruct the jury as to self-defense?
> IV. Did the trial court err in admitting the 911 call made by the decedent?

## FACTS

[¶3] Charles Darrell Laster and Lavena Laster were originally married in 1996, divorced in 2004, remarried in 2007, and separated again, though not divorced, in 2010. In 2010, the Lasters were living in Shoshoni, Wyoming, and when they separated, Mrs. Laster moved to Mesa, Arizona. Mrs. Laster lived in Arizona until March 2013, when Mr. Laster bought her a bus ticket so she could return to Shoshoni. When Mrs. Laster returned to Shoshoni, she stayed with her daughter, Teri Hughes. Mr. and Mrs. Laster did not reunite, but they remained good friends.

[¶4] While living in Arizona, Mrs. Laster met and began dating Mr. Bruce. The two were still dating when Mrs. Laster returned to Shoshoni, and Mr. Bruce joined Mrs. Laster in Shoshoni about a month after her return. Mrs. Laster and Mr. Bruce initially stayed with Mrs. Laster's daughter, Teri Hughes, and then eventually moved into a one-bedroom home. Mrs. Laster and Mr. Bruce could not afford to rent the home, so Mrs.

1

Laster asked Mr. Laster to rent the home for them, which he agreed to do. Mrs. Laster and Mr. Bruce did odd jobs around Mr. Laster's place to help work off the rent.

[¶5] On May 14, 2013, Mrs. Laster was at Mr. Laster's home drinking. She had been drinking for several days and described herself as a "blackout drinker." At about 9:00 or 9:30 that morning, Mr. Bruce had coffee at the home of Mr. Laster's next door neighbor, Norman Hughes, who is also the father-in-law of Teri Hughes. Mr. Hughes reported that Mr. Bruce was intoxicated, and angry and distraught, because Mr. Laster had put his hand on Mrs. Laster's leg. Mr. Bruce spent the day at Mr. Hughes' home and went back and forth between the homes of Mr. Laster and Mr. Hughes several times throughout the day.

[¶6] At one point, Mr. Bruce told Mr. Hughes that he was going to return to Arizona and he had a check that Mr. Laster had given him to pay for his return trip. Mr. Bruce left Mr. Hughes' home at about 5:00 or 6:00 on the evening of May 14th, and Mr. Hughes described his departure:

> Q. Tell us about that. Tell us about him leaving, if you would.
> A. Well, like I said, I kept telling him, you're not going to get a bus ticket. The best thing you can do is, intoxicated, you can always go home and sleep it off. If you feel like you still want to leave in the morning, then by all means, do it.
> Q. And did he leave?
> A. Yes, he did.
> Q. Tell us about that.
> A. He got into Darrell's [Mr. Laster's] bright blue Mustang, spun gravel as he was leaving, and then he left.

[¶7] At some point after Mr. Bruce left, Mrs. Laster looked outside Mr. Laster's home and saw that Mr. Laster's blue Mustang was gone. Mrs. Laster reported this to Mr. Laster, and in response, Mr. Laster loaded two rifles and two handguns. When Mrs. Laster asked Mr. Laster why he was preparing the firearms, Mr. Laster replied that he was "not going to take an ass whooping from a young man."[1] The Lasters placed the firearms in Mr. Laster's truck and drove over to the home that Mrs. Laster and Mr. Bruce shared. Once there, Mrs. Laster saw that the keys were in the Mustang, so she did not go in the home and instead got in the car and followed Mr. Laster back to his home.

[¶8] Upon their return to Mr. Laster's home, the Lasters carried the firearms into the home and into the back bedroom. Mr. Laster unloaded the firearms, leaving the

---

[1] The record indicates that on May 14, 2013, Mr. Laster was sixty-five years old and Mr. Bruce was forty-five years old.

ammunition in a pile on the floor. At some point, while the Lasters were in the back bedroom, Mr. Bruce entered the home and came to the back bedroom. Mr. Bruce had a beer bottle in his hand, and he and Mr. Laster talked about something that Mrs. Laster could not recall. Mr. Bruce then struck Mrs. Laster on the left side of her head with the beer bottle, rendering her unconscious.

[¶9] When Mrs. Laster awoke, Mr. Laster was on the telephone speaking to a 911 dispatcher. During Mr. Laster's conversation with the 911 dispatcher he reported that he needed medical assistance for his wife. Mr. Laster also reported to the 911 dispatcher that he also was hit a couple of times on the head with a beer bottle, that "Shay something" was the person who assaulted him, and that the assailant was no longer in the home.

[¶10] EMTs and a deputy sheriff responded to the call for emergency assistance. The deputy reported that both the Lasters were intoxicated, with slurred speech, but Mr. Laster was not at a "high level" of intoxication for him. Mrs. Laster was unwilling to speak with the sheriff's deputy, and when the deputy began to interview Mr. Laster, she told him not to tell the deputy anything. The deputy separated the Lasters, and Mr. Laster then cooperated and answered the deputy's questions, speaking with him for about ten or fifteen minutes. Mrs. Laster initially refused any medical treatment, but then when the deputy threatened to take her into protective custody, she agreed to be examined by the EMTs but refused transport to the hospital.

[¶11] Teri Hughes arrived at Mr. Laster's home about ten minutes after the sheriff's deputy. Ms. Hughes went to the home because she was worried about her mother (Mrs. Laster) and her stepfather (Mr. Laster). Ms. Hughes reported that she was worried because at about 10:30 that evening, Mr. Bruce had called her from the Fast Lane convenience store and asked her to pick him up. When Ms. Hughes arrived to pick up Mr. Bruce, he was upset, intoxicated, and had a beer in his hand. Mr. Bruce told Ms. Hughes that Mr. Laster hit him with a Maglite flashlight, and he had her feel the lump on the back of his head. Ms. Hughes testified:

> Q. Okay. All right. So he's upset. He tells you that your dad hit him with a Maglite flashlight. Did you notice – did you notice anything else about him?
> A. He had bloody knuckles.
> Q. Okay. Do you remember if it was his right hand or his left hand?
> A. No, I don't.
> Q. Okay. Is he talking about anything else besides that at this point?
> A. He says he's – I knew he was mad at my mom.

3

Q. Okay. How did you know he was mad at your mom?

A. Because she's over at my dad's.

Q. Okay. How do you know that?

A. Because he said.

Q. Okay. So did you just drop him off at his house?

A. No.

Q. Okay. Why not?

A. He wanted me to go inside.

Q. Why did you go inside with him if he was upset?

A. I thought I could calm him down.

Q. So what happens when you get inside?

A. He starts hollering about my mom and dad.

Q. What did he say?

A. He said that they – that they fucked him, and that he hurt them.

Q. Besides – in addition, did he say anything else besides that he had f'd them and he had hurt them?

A. He said that they got what they deserved.

Q. Okay. Did he say – did he say where – did he say where they were at when he hurt them and he f'd them?

A. He said he walked into dad's house and didn't see mom and dad nowhere, and that he walked into the back bedroom and that he thought my mom and dad were having sex.

Q. What else did he say?

A. He just kept repeating that he was mad and kept ranting.

[¶12] When Ms. Hughes arrived at Mr. Laster's home, she checked on both of her parents. Mrs. Laster would not let Ms. Hughes look closely at her, but she was able to closely check over Mr. Laster. She found no blood, no bruises, and no scratches, and she found that he looked and seemed fine. She then returned home.

[¶13] After the EMTs, the deputy sheriff, and Ms. Hughes left Mr. Laster's home, Mrs. Laster fell asleep on a futon in Mr. Laster's home. When she awoke in the morning, the morning of May 15, 2013, she found Mr. Laster face down on the floor and unresponsive. EMTs eventually arrived and confirmed that Mr. Laster was deceased. An autopsy revealed that Mr. Laster died of a right subdural hemorrhage caused by blunt force trauma.

4

[¶14]  On May 16, 2013, the State filed a criminal information charging Mr. Bruce with second degree murder in the death of Mr. Laster and domestic violence battery for the injury to Mrs. Laster.  Mr. Bruce was bound over to the district court, where he pled not guilty to both charges.

[¶15]  On October 10, 2013, the State filed a motion requesting a pretrial ruling on the admissibility of the 911 call Mr. Laster made on the evening of May 14, 2013.  Mr. Bruce responded with a motion in limine to exclude the 911 call on the ground that admitting the evidence would violate his Sixth Amendment right to confrontation.  Following a hearing on the issue, the district court ruled that the 911 call was admissible hearsay and that admission of the call would not violate Mr. Bruce's Sixth Amendment right to confrontation.

[¶16]  A jury trial was held on November 18-22, 2013.  At the close of the State's case, Mr. Bruce made a motion for judgment of acquittal on the second degree murder charge, and the district court denied the motion.  Mr. Bruce renewed his motion at the close of all evidence, and the court again denied the motion.  The jury returned a verdict finding Mr. Bruce not guilty on the second degree murder charge, guilty on the lesser included offense of manslaughter, and guilty on the domestic violence battery charge.  On December 6, 2013, Mr. Bruce filed a written motion for judgment of acquittal and for a new trial based on the jury's exposure to inadmissible hearsay testimony and on the district court's failure to instruct the jury on self defense.  The court denied Mr. Bruce's motion.

[¶17]  On March 14, 2014, the district court entered its Judgment and Sentence.  The court sentenced Mr. Bruce to a prison term of four to ten years on the manslaughter count and 180 days on the domestic violence battery count, both sentences to be served concurrently.  Mr. Bruce thereafter timely filed a notice of appeal to this Court.

## DISCUSSION

[¶18] Mr. Bruce challenges his manslaughter conviction on several grounds: 1) the district court's denial of his motion for judgment of acquittal on the second degree murder charge; 2) sufficiency of the evidence to support his manslaughter conviction; 3) the district court's denial of his new trial motion based on the jury's exposure to inadmissible hearsay; 4) the district court's failure to give the jury a self defense instruction; and 5) the district court's admission of Mr. Laster's 911 call.  Mr. Bruce presents the district court's ruling on the 911 call as his last assignment of error, but because our resolution of that issue may affect our consideration of the other alleged errors, we will address the ruling on the 911 call first and then turn to Mr. Bruce's remaining arguments.

5

## A.    Admissibility of 911 Call

[¶19]  In arguing that the district court erred in admitting Mr. Laster's 911 call, Mr. Bruce contends that the evidence was admitted in violation of his Sixth Amendment right of confrontation and was inadmissible hearsay.  Whether an evidentiary ruling violates a defendant's Sixth Amendment right to confront witnesses against him is a question of law that this Court reviews de novo.  *Counts v. State*, 2012 WY 70, ¶ 31, 277 P.3d 94, 104 (Wyo. 2012); *Hannon v. State*, 2004 WY 8, ¶ 11, 84 P.3d 320, 328 (Wyo. 2004).  We review rulings on the admissibility of evidence for an abuse of discretion:

> This Court reviews alleged errors relating to the admission of evidence for an abuse of discretion.  *Marquess v. State*, 2011 WY 95, ¶ 12, 256 P.3d 506, 510 (Wyo.2011).  "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Lancaster v. State*, 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo.2002) (citing *Trujillo v. State*, 2 P.3d 567, 571 (Wyo.2000)).  A trial court's evidentiary rulings "are entitled to considerable deference," and will not be reversed "so long as there exists a legitimate basis for the trial court's ruling...." *Armstrong v. Hrabal*, 2004 WY 39, ¶ 10, 87 P.3d 1226, 1230 (Wyo.2004) (internal quotes and citations omitted).

*Ortiz v. State*, 2014 WY 60, ¶ 67, 326 P.3d 883, 897 (Wyo. 2014).

[¶20]  While Mr. Bruce's arguments are directed at particular isolated statements within Mr. Laster's 911 call, the context of those statements is important in our consideration of both of Mr. Bruce's arguments.  We therefore set forth the entire text of the call against which we will consider Mr. Bruce's confrontation clause and hearsay arguments.

Shey Bruce Criminal No. 6912
911 call on assault

Dispatcher:   911 what's the address of the emergency?

C. Laster:    My Wife (sic) has been assaulted, and she was hit real hard in the temple lobe.  I don't know if we need an ambulance or if I should just bring her in, but I'll let you talk to her and then she can explain it.

Dispatcher:   Okay.

6

L. Laster:     Hello.

Dispatcher:   Hi this is the 911 Center, What's the address that you're at?

L. Laster:     115 Main Street.

Dispatcher:   Okay and what is your name?

C. Laster:     We live in the alley.

L. Laster:     Lavena Laster.

Dispatcher:   What was your name again?

L. Laster:     Lavena Laster.

Dispatcher:   Lavena, Okay.

C. Laster:     Hello.

Dispatcher:   Okay what's the phone number your (sic) calling me from Lavena?

C. Laster:     A guy was over here and hit her temple lobe and she's having severe headaches now.

L. Laster:     My head hurts.

C. Laster:     And I think we might need to get her to a hospital.

Dispatcher:   Okay, what's the phone number that you're calling me from?

C. Laster:     I'm calling from [telephone number redacted].

Dispatcher:   Okay, now is the person that assaulted her, are they still there?

C. Laster:     Beg your pardon?

Dispatcher:   The person that assaulted her, are they still there?

C. Laster:     No, I got hit a couple times in the head with a beer bottle, but they have left ...

(L. Laster repeatedly yelling her head hurts in background)

C. Laster:    Hun, [we're] gonna try to get you to the hospital here as quick as we can.

Dispatcher:   Okay, how old is your wife?

C. Laster:    49.

Dispatcher:   Okay.  Is her breathing normal?

C. Laster:    Beg your pardon?

Dispatcher:   Is she breathing normally?

C. Laster:    Ya she's just got severe headaches.

Dispatcher:   Okay.

C. Laster:    And . . .

Dispatcher:   Okay does she . . .

C. Laster:    I don't know if she's got blood clots or what in her head.

Dispatcher:   Okay.  When did this happen?

C. Laster:    About 20 minutes ago.

Dispatcher:   Okay does she have any numbness or paralysis[?]

C. Laster:    Your (sic) gonna have to talk to her.  Hun, Hun talk to . . . this is 911, Hun you gotta talk to them.

L. Laster:    No.

C. Laster:    You gotta talk to them.

Dispatcher:   Lavena?

L. Laster:    What? Yes, What?

Dispatcher:   Lavena do have any numbness or paralysis?

L. Laster:    No you know my head fucking hurts . . .

Repeatedly yelling ouch . . .

Dispatcher:   Lavena . . .

L. Laster:      . . . Repeatedly yelling ouch. . .

Dispatcher:   Have you had any recent changes in your behavior[?]

C. Laster:      Maybe she wasn't much information but she's hurting pretty bad.

Dispatcher:   Okay, where did this happen at Charles?

C. Laster:      Beg your pardon.

Dispatcher:   Where did this happen at?

C. Laster:      In my house.

Dispatcher:   At your house, okay.  Where's the person that assaulted you guys?

C. Laster:      Shay something, I don't know his last name, but I'm alright.

Dispatcher:   Okay.  Where did the person go that assaulted you?

C. Laster:      I don't know exactly what the address but it[']s right across from the high school in Shoshoni.

Dispatcher:   Okay.

C. Laster:      Hun we've got help coming it's on the way.

Dispatcher:   Okay.  I'm sending the ambulance now.  Stay on the line and I will tell you exactly what to do.

C. Laster:      Okay.  I'm at 115 Main . . .

Dispatcher:   Are you at 115 or 117 Main?

C. Laster:      Either one, I own two pieces of property, and I live in a trailer in the back, in the alley.

Dispatcher:   Okay, and you're at the trailer in the back?

9

C. Laster:     I live in the mobile home in the back.

Dispatcher:   Okay.   Okay, reassure her that help is on the way, don't let her have anything . . .

C. Laster:     Hey babe, help[']s on the way.

Dispatcher:   Okay don't let her have anything to eat or drink, as it might make her sick or cause problems for the doctor.

C. Laster:     I'm hard of hearing . . . Hun help is on the way babe, Hun helps on the way.

L. Laster:     Right now (inaudible).

C. Laster:     There's nothing I can do for you [now], helps on the way.  Hun .. .

Dispatcher:   Okay, are you still there Charles?

C. Laster:     Beg your pardon.

Dispatcher:   Don't let her have anything to eat or drink, as it might make her sick or cause problems for the doctor.

C. Laster:     Okay well just get some help over here and give me the instructions when they get here.

Dispatcher:   Okay.

C. Laster:     And right now I'm worried about my wife, and I'm not listening to instructions.

Dispatcher:   Okay Charles we've got the ambulance paged and I've got a deputy on his way over there right now.

C. Laster:     Okay sounds good.

Dispatcher:   Okay.

C. Laster:     Okay thanks ma'am.

Dispatcher:   You're welcome.

C. Laster:     I appreciate it.

Dispatcher:   Not a problem.

10

C. Laster:     Okay.

Dispatcher:   Alright.

C. Laster:     Okay, bye.

Dispatcher:   Bye.

RECORDING ENDS

## 1.    *Sixth Amendment Ruling*

[¶21]  The Sixth Amendment protects a defendant's right to confront witnesses against him, and owing to that protection, testimonial statements of a witness absent from trial are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004); *see also Anderson v. State*, 2014 WY 13, ¶ 27, 317 P.3d 1108, 1118 (Wyo. 2014); *Rodriguez v. State*, 2010 WY 170, ¶ 9, 245 P.3d 818, 823 (Wyo. 2010); *Szymanski v. State*, 2007 WY 139, ¶ 16, 166 P.3d 879, 883 (Wyo. 2007).  Stated as a three-part test, the Sixth Amendment confrontation clause bars the admission of an out-of-court statement if the statement is testimonial, the declarant is unavailable, and the defendant had no opportunity to cross-examine the declarant concerning the statement. *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374; *Szymanski*, ¶ 16, 166 P.3d at 883.

[¶22] In *Crawford*, the Supreme Court abandoned consideration of a statement's reliability in determining admissibility under the Sixth Amendment. *Crawford*, 541 U.S. at 60-62, 124 S.Ct. at 1369-70; *Teniente v. State*, 2007 WY 165, ¶ 77, 169 P.3d 512, 533-34 (Wyo. 2007); *Vigil v. State*, 2004 WY 110, ¶ 18, 98 P.3d 172, 177-78 (Wyo. 2004). The Court explained that while the reliability of a statement may be a proper consideration in the application of hearsay rules, it is not a factor to be considered in determining the admissibility of a statement under the Sixth Amendment. *Crawford*, 541 U.S. at 60-62, 124 S.Ct. at 1369-70.   If the statement is testimonial, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.*, 541 U.S. at 69, 124 S.Ct. at 1374; *see also Bush v. State*, 2008 WY 108, ¶ 34, 193 P.3d 203, 211-12 (Wyo. 2008); *Teniente*, ¶ 77, 169 P.3d at 535; *Vigil*, ¶ 18, 98 P.3d at 179.

[¶23] The Supreme Court did not in *Crawford* attempt to fully define the difference between a testimonial statement and a non-testimonial statement.  The Court stated:

> We leave for another day any effort to spell out a comprehensive definition of "testimonial."  Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial;

and to police interrogations.

*Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374 (footnote omitted).

[¶24]  A couple of years after *Crawford*, the Supreme Court did flesh out the distinction between testimonial and non-testimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006) (footnote omitted); *see also Szymanski*, ¶ 18, 166 P.3d at 884.

[¶25]  In *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the Supreme Court again addressed the distinction between testimonial and non-testimonial statements.  The Court did not expand the definition but provided guidance in making the determination, emphasizing in particular the objective nature of the inquiry:

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation."  The circumstances in which an encounter occurs—*e.g.,* at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards— are clearly matters of objective fact.  The statements and actions of the parties must also be objectively evaluated.  That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

*Bryant*, 562 U.S. at ___, 131 S.Ct. at 1156 (footnote omitted).

[¶26]  The Court explained why the existence of an ongoing emergency is an important factor in determining the primary purpose of an interrogation.

As our recent Confrontation Clause cases have explained, the existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation. The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Rather, it focuses them on "end[ing] a threatening situation."

*Bryant*, 562 U.S. at \_\_\_, 131 S.Ct. at 1157 (footnote and internal citations omitted).

[¶27] To summarize, the Sixth Amendment analysis requires an objective determination of an interrogation's "primary purpose" based on the circumstances in which the interrogation takes place as well as the statements and actions of both the interrogator and the declarant. *Bryant*, 562 U.S. at \_\_\_, 131 S.Ct. at 1156. In particular, the inquiry must determine whether the interrogation's primary purpose was to enable assistance to meet an ongoing emergency, or whether it was "to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 1165 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266); *see also Bush*, ¶ 39, 193 P.3d at 213; *Szymanski*, ¶ 16, 166 P.3d at 883.

[¶28] Against this backdrop, we review the district court's ruling on the admissibility of Mr. Laster's 911 call under the Sixth Amendment. In ruling that the 911 call was admissible, the court found that it was a non-testimonial statement. The court reasoned:

> In listening to the 911 call, and reading the transcript provided by the defendant the Dispatcher asks several questions concerning the location of the emergency, the names of the people on the call, the phone number of the emergency location, when the injury occurred, and lastly the location of the person who committed or caused the injury. The Dispatcher asks these same questions several times, and in different manners; however, what is glaringly absent is the who. One of the most important elements of proof of any crime is the identity of the defendant. In this instance, the Dispatcher never asks the Lasters who hurt them. All of her questions were to appropriately respond to [the] ongoing medical emergency. Even after Mr. Laster apparently misunderstood the Dispatcher's question "Where's the person that assaulted you guys?" and answered "Shay something, . . ."[,] [t]he Dispatcher reiterated the location question and she did not illicit information about the identity of the perpetrator. She does not ask any other potentially

13

identifying or criminal investigative type questions. The Court finds that taken as a whole, and viewed objectively, the questions posed by the 911 operator were primarily, if not exclusively, posed in response to the medical emergency perceived by Mr. Laster.

[¶29] Mr. Bruce takes issue with the district court's ruling, arguing there was no on-going emergency because the call was made over twenty minutes after the assault, and that if there were an emergency, it was Mrs. Laster's emergency, not Mr. Laster's emergency. Mr. Bruce further argues the district court placed too much emphasis on the dispatcher's statements and too little on Mr. Laster's statements. We reject Mr. Bruce's arguments and agree with the district court that Mr. Laster's statements during the 911 call were non-testimonial.

[¶30] First, we reject Mr. Bruce's contention that there was not an on-going emergency. On the recording of the 911 call, Mrs. Laster can be heard, sometimes speaking to the dispatcher and sometimes in the background, repeatedly stating that her head hurts, crying ouch, moaning and making sounds of distress. For his part, Mr. Laster repeatedly expresses his concern with Mrs. Laster's severe headaches and expresses a concern that she may have blood clots in her head. While the assault itself had ended, the medical emergency clearly continued.

[¶31] We likewise find no merit in the assertion that the emergency should be rejected as a consideration in the Sixth Amendment analysis because the emergency was Mrs. Laster's and not Mr. Laster's. The focus of the "primary purpose" analysis is on the reason for the interrogation and the reason for the declarant's statements. While there may be instances where a declarant's relationship to an emergency may call into question the declarant's motives and whether the declarant's statements stemmed from a true concern regarding the emergency, the record does not support that suggestion in this case. Mrs. Laster testified that when she regained consciousness, Mr. Laster was already making the 911 call to get her help. Additionally, during the call, Mr. Laster tried to have Mrs. Laster provide information to the dispatcher, only to have Mrs. Laster persist in moaning and making other sounds of distress. Throughout the call, Mr. Laster spoke words of comfort to his wife and repeatedly expressed his concern with his wife's head injury and the need to get her medical help. Given the circumstances and Mr. Laster's focus on his wife's condition, we conclude that Mr. Laster made the 911 call because his wife was unable to make the call for herself, because he was concerned about his wife's head injury, and because he was seeking immediate medical assistance for his wife. The on-going emergency is thus properly considered in the Sixth Amendment analysis even though it was Mrs. Laster's injuries that created the emergency and Mr. Laster who made the 911 call.

[¶32] Finally, we address Mr. Bruce's contention that the district court placed too much emphasis on the dispatcher's questions and not enough emphasis on Mr. Laster's

statements. In particular, Mr. Bruce argues that Mr. Laster's statements in which he reported he was "hit a couple times in the head with a beer bottle," and in which he identified his assailant as "Shay something," were testimonial statements and should have been redacted from the recording and transcript presented to the jury. We reject this argument because it fails to take into consideration the entirety of the circumstances in which the statements were made.

[¶33] In holding that the statements of both the interrogator and the declarant must be considered when conducting a Sixth Amendment analysis, the Supreme Court did not suggest that the questions and statements of each participant be considered in isolation. The Court instead emphasized the need to consider the questions and statements together and in light of the circumstances.

> In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation. See, *e.g.*, *Davis*, 547 U.S., at 827, 126 S.Ct. 2266 ("[T]he nature of what was *asked and answered* in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford* ) what had happened in the past" (first emphasis added)). . . .

> . . . In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers. To give an extreme example, if the police say to a victim, "Tell us who did this to you so that we can arrest and prosecute them," the victim's response that "Rick did it," appears purely accusatory because by virtue of the phrasing of the question, the victim necessarily has prosecution in mind when she answers.

> . . . .

> . . . During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant. A victim may want the attacker to be incapacitated temporarily or rehabilitated. Alternatively, a severely injured victim may have no purpose at all in answering questions posed; the answers may be

simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution. Taking into account a victim's injuries does not transform this objective inquiry into a subjective one. The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim— circumstances that prominently include the victim's physical state.

*Bryant*, 562 U.S. at ___, 131 S.Ct. at 1160-62 (footnote omitted).

[¶34] As the foregoing discussion illustrates, the focus of the Sixth Amendment analysis is not on the statements in isolation but on the purpose of those statements as framed by their context. The fact then that Mr. Laster reported what happened to him and the identity of his assailant does not make those statements testimonial. The statements are testimonial only if the context in which they were made indicates that Mr. Laster's purpose in making the statements was to assist in a future prosecution, and in this case, we find nothing to suggest such a purpose.

[¶35] First, none of the dispatcher's questions were prosecution oriented. The dispatcher's questions were directed at determining the location of the emergency, the nature of the injury, and whether the assailant was still in the area. These are questions directed at enabling the dispatcher to send assistance efficiently and safely. As the district court observed, the dispatcher at no time asked for the identity of the assailant. Nor did the dispatcher ask questions concerning what happened during the altercation or why. Thus, none of the dispatcher's questions would have signaled Mr. Laster that he was providing information for a future prosecution.

[¶36] The remaining circumstances likewise weigh against finding any prosecutorial purpose in Mr. Laster's statements. Throughout most of the call, Mrs. Laster can be heard in the background yelling and moaning in pain. Mr. Laster himself was hard of hearing, intoxicated, and was dividing his attention between the dispatcher and his wife. For example, immediately after Mr. Laster told the dispatcher that he had been hit a couple of times with a beer bottle, he turned his attention to Mrs. Laster and told her he was trying to get her help as quick as he could. Likewise, shortly after identifying "Shay something" as his assailant, Mr. Laster again spoke to his wife, telling her that help was on the way.

[¶37] It is clear from the entirety of the 911 call, that Mr. Laster did not call 911 to report that a crime had been committed. He called to seek medical assistance for his wife. When Mr. Laster's statements concerning what happened to him and the identity of

16

his assailant are considered in the context in which they were made, we cannot conclude that those statements changed the primary purpose of the call from seeking medical assistance to assisting in a future prosecution. Mr. Laster's focus throughout the call remained on his wife's injury, and to the extent he provided additional information, the circumstances indicate that the information was offered "reflexively," with no change in Mr. Laster's purpose for providing the information. *See Bryant*, 562 U.S. at ___, 131 S.Ct. at 1161.

[¶38] The facts of this case are analogous to those addressed by the Supreme Court in *Bryant*. In *Bryant*, the victim suffered a mortal gunshot wound at one location and then drove to a gas station. *Bryant*, 562 U.S. at ___, 131 S.Ct. at 1150. Police officers reported to the gas station and found the victim on the ground bleeding from the wound. *Id*. The officers asked the victim, "what had happened, who had shot him, and where the shooting had occurred." *Id*. The victim answered those questions, and the Court held the victim's statements were admissible because the purpose of the interrogation was to address an ongoing emergency. *Id*. The Court explained, in part:

> The circumstances of the encounter provide important context for understanding [the victim's] statements to the police. When the police arrived at [the victim's] side, their first question to him was "What happened?" [The victim's] response was either "Rick shot me" or "I was shot," followed very quickly by an identification of "Rick" as the shooter. In response to further questions, [the victim] explained that the shooting occurred through the back door of Bryant's house and provided a physical description of the shooter. When he made the statements, [the victim] was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen. His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive. He was obviously in considerable pain and had difficulty breathing and talking. From this description of his condition and report of his statements, we cannot say that a person in [the victim's] situation would have had a "primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution."
>
> For their part, the police responded to a call that a man had been shot. As discussed above, they did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred. The questions they asked—"what had happened, who had shot him, and

17

where the shooting occurred,"—were the exact type of questions necessary to allow the police to "'assess the situation, the threat to their own safety, and possible danger to the potential victim'" and to the public, including to allow them to ascertain "whether they would be encountering a violent felon[.]" In other words, they solicited the information necessary to enable them "to meet an ongoing emergency."

*Bryant*, 562 U.S. at ___, 131 S.Ct. at 1165-66 (footnotes and internal citations omitted).

[¶39] For the foregoing reasons, we find Mr. Laster's statements during the 911 call were non-testimonial and that the district court did not err in ruling that the statements were admissible under the Sixth Amendment. Having concluded that the district court did not err in its Sixth Amendment analysis, we next consider whether the court abused its discretion in admitting Mr. Laster's statements over Mr. Bruce's hearsay objections. *See Davis*, 547 U.S. at 821, 126 S.Ct. at 2273 (though not barred by the confrontation clause, non-testimonial statement remains subject to traditional limitations on hearsay evidence); *see also Majors v. State*, 2011 WY 63, ¶ 24, 252 P.3d 435, 441, n.2 (Wyo. 2011); *Bush*, ¶ 28, 193 P.3d at 210.

## 2. *Hearsay Ruling*

[¶40] Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). "Hearsay statements are generally inadmissible because they are made outside of court and, therefore, presumed to be unreliable." *Moore v. State*, 2013 WY 146, ¶ 11, 313 P.3d 505, 508 (Wyo. 2013) (citing W.R.E. 802). A hearsay statement is admissible, however, if it fits a recognized exception to the hearsay rule making it sufficiently reliable. *Moore*, ¶ 11, 313 P.3d at 508 (citing *Sanders v. State*, 7 P.3d 891, 895 (Wyo. 2000); *Johnson v. State*, 930 P.2d 358, 361–62 (Wyo. 1996)).

[¶41] The State argued that Mr. Laster's statements were admissible under four hearsay exceptions: 1) as a present sense impression under Wyoming Rule of Evidence 803(1); 2) as an excited utterance under W.R.E. 803(2); 3) as a statement of then-existing mental, emotional or physical condition under W.R.E. 803(3); and 4), under the catchall provisions of W.R.E. 804(b)(6). The district court found the statements admissible "under a combination of the exceptions to the hearsay rule," and specifically referred to the exception for statements concerning then-existing mental and emotional condition and the Rule 804(b)(6 ) catchall. Though not specifically cited by the district court as an exception applicable to Mr. Laster's statements, the district court's analysis also incorporated a discussion of the present sense impression exception.

[¶42] We disagree with the district court's application of the exception for the declarant's then-existing mental, physical, or emotional condition. The testimony the State sought to rely upon related to a fact, that Mr. Laster had been hit by a beer bottle by a man named Shey. The rule specifically excludes a statement "of memory or belief to prove the fact remembered or believed" unless the statement relates to the execution of a will. W.R.E. 803(3); 4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 8:70 (4th ed. 2013).

[¶43] We also reject application of the Rule 803(1) present sense impression exception to Mr. Laster's statements. That rule requires that the statement describe or explain an event "while the declarant was perceiving the event or condition, or immediately thereafter." W.R.E. 803(1). We have explained:

> The phrase "immediately thereafter" accommodates the human realities that the condition or event may happen so fast that the words do not quite keep pace, and proving a true match of words and events may be impossible for ordinary witnesses, so it would be foolish to require a statement to be truly simultaneous with the event or condition. The exception allows enough flexibility to reach statements made a moment after the fact, where a small delay or "slight lapse" ... is not enough to allow reflection, which would raise doubts about trustworthiness.

*Schultz v. State*, 2007 WY 162, ¶ 23, 169 P.3d 81, 88 (Wyo. 2007) (quoting 4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 434, at 384–85 (2d ed. 1994)). In this case, Mr. Laster's statements were made twenty to twenty-five minutes earlier. This is not contemporaneous enough to fall within the Rule 803(1) exception.

[¶44] In terms of the exceptions applied by the district court, that brings us to application of W.R.E. 804(b)(6), one of the "catchall" exceptions. This Court has, however, observed that the catchall exceptions, W.R.E. 803(24) and 804(b)(6), are to be cautiously used only in exceptional cases, in the interest of justice. *Williams v. Collins Communications*, 720 P.2d 880, 888 (Wyo. 1986). The catchalls under both Rules 803 and 804 specifically say that they apply to statements "not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness . . . ." The two rules, read together, suggest that the catchall exception is only to be used if there is no other well-established hearsay exception. One evidence treatise concludes that the placement of the catchall in the federal rules suggests that it was intended as a rule of last resort. 5 Christopher B. Mueller and Laird C. Kirkpatrick,

*Federal Evidence* § 8:108 (4th ed. 2013).[2]

[¶45] In a pre-*Crawford* Confrontation Clause case, the United States Supreme Court explained the reliability of traditional hearsay exceptions:

> We note at the outset that Idaho's residual hearsay exception, Idaho Rule Evid. 803(24), under which the challenged statements were admitted, is not a firmly rooted hearsay exception for Confrontation Clause purposes. Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements. The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial. See, *e.g.,* Senate Judiciary Committee's Note on Fed.Rule Evid. 803(24), 28 U.S.C.App., pp. 786–787; E. Cleary, McCormick on Evidence § 324.1, pp. 907–909 (3d ed. 1984). Hearsay statements admitted under the residual exception, almost by definition, therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception.

*Idaho v. Wright*, 497 U.S. 805, 817-18, 110 S.Ct. 3139, 3147-48, 111 L.Ed.2d 638 (1990) (some citations omitted).[3]

[¶46] Based on the foregoing, we believe that the catchall exceptions, Rules 803(24) and 804(b)(6), should be rules of last resort, and that particularly in criminal cases, they should not be used if a traditional exception applies. In this case, we find a traditional exception in the Rule 803(2) excited utterance exception. Although the district court did not rely on this exception, we may affirm the court's decision on any basis appearing in the record. *Leach v. State*, 2013 WY 139, ¶ 19, 312 P.3d 795, 799 (Wyo. 2013).

---

[2] The Federal Rules of Evidence originally had two separate catchall provisions as the Wyoming rules still do. They were consolidated into F.R.E. 807 in 1997. 5 Christopher B. Mueller and Laird C. Kirkpatrick, *supra*, § 8:139.

[3] *Crawford* overruled *Wright* and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed. 2d 597 (1980) by holding that testimonial statements were not admissible even if they were reliable under the criteria of those cases. Those cases may have continued vitality as to non-testimonial hearsay like that in this case, although that is not clearly resolved. 5 Christopher B. Mueller and Laird C. Kirkpatrick, *supra*, § 8:31.

[¶47] An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." W.R.E. 803(2). We have said:

> The exception is founded upon the proposition that a statement made during the stress of excitement resulting from a startling event is probably trustworthy, since there is not leisure to reflect, contrive or fabricate. The rule assumes the presence of a startling event which temporarily stills the senses and alleviates any motive to fabricate.

*Marquess v. State*, 2011 WY 95, ¶ 17, 256 P.3d 506, 512 (Wyo. 2011) (quoting *Boykin v. State*, 2005 WY 15, ¶ 7, 105 P.3d 481, 483 (Wyo. 2005)).

[¶48] This Court has identified five factors to be considered in applying the excited utterance exception: (1) the nature of the startling event; (2) the declarant's physical manifestation of excitement; (3) the declarant's age; (4) the lapse of time between the event and the hearsay statement; and (5) whether the statement was made in response to an inquiry. *Marquess*, ¶ 17, 256 P.3d at 512; *Sanchez v. State*, 2011 WY 77, ¶ 22, 253 P.3d 136, 143 (Wyo. 2011). We have also observed that while these factors are helpful, the ultimate inquiry remains whether the "declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Sanchez*, ¶ 22, 253 P.3d at 143 (quoting *Boykin*, ¶ 8, 105 P.3d at 483); *see also Dike v. State,* 990 P.2d 1012, 1021 (Wyo. 1999).

[¶49] A review of the 911 call reveals that a reasonable judge could find that Mr. Laster's statements fit within the excited utterance exception. Seeing one's spouse struck by a beer bottle and being struck oneself is undoubtedly startling, and the statements at issue related to the startling event. The content of the call, and in particular Mrs. Laster's cries of pain and distress, and Mr. Laster's attempts to comfort her, establishes that Mr. Laster was still under the stress of excitement caused by the event. Although Mr. Laster's statements were made in response to an inquiry by the 911 dispatcher, we do not in this case find this fact sufficient to take the statements outside the excited utterance exception. Mr. Laster's statements were not responsive to the questions being asked, and in this type of circumstance, we have explained:

> The fact that she made the challenged statement in response to an inquiry is not sufficient under the circumstances to take the statement outside the excited utterance exception. The convenience store clerk asked, "Are you all right?" Ms. Potter responded according to the store clerk that her boyfriend assaulted her when he could not find the cheese. This non-

responsive answer to the store clerk's inquiry further suggests that Ms. Potter's statement was spontaneous and not the result of reflection, deliberation, or fabrication.

*Boykin*, ¶ 10, 105 P.3d at 484.

[¶50] As to the lapse of time between the startling event and the hearsay statements, the excited utterance exception, unlike the present sense impression exception, does not require immediacy.

> *Time factor.* Other things being equal, the more quickly a statement follows the occasion, the more likely it is to be a spontaneous reaction. Statements during or immediately after an exciting occurrence clearly can satisfy the exception in being the product of stress or excitement. This kind of close connection, however, is only indispensable in the exception for present sense impressions, and such immediacy is not required by the excited utterance exception.
>
> Resort to the excited utterance exception is entirely appropriate in the face of lapses of minutes between event and utterance, where it is clear that the speaker was still laboring under stress that stilled reflective capacity, as is likely if the event was sudden or violent or frightening, or caused injury or pain to the speaker or someone he knows.
>
> Even much longer lapses, on the order of several hours, do not necessarily dissipate the stress or excitement caused by an act or event, particularly in cases that result in injury or trauma to the speaker. Here the condition of the speaker between the event and the statement is important, and continuing emotional or physical shock, loss of consciousness, persistent pain, unabated fright, isolation, and other factors may prolong the impact of a stressful event, particularly one that is long lasting and arduous. Sensible decisions apply the exception despite time lapses of this sort when it comes to statements by victims of brutal or terrifying crimes, including assault and kidnap, particularly when they are of tender years.

4 Christopher B. Mueller and Laird C. Kirkpatrick, *supra*, § 8:68[4]; *see also Dike*, 990 P.2d at 1021 (applying exception where statements were made thirty minutes after event); *Streitmatter v. State*, 981 P.2d 921, 927 (Wyo. 1999) (applying exception where statements were made forty-five minutes after event); *James v. State*, 888 P.2d 200, 206 (Wyo. 1994) (applying exception where statements were made fifteen to thirty minutes after event).

[¶51]  In this case, the lapse of time between the startling event and Mr. Laster's 911 call was twenty to twenty-five minutes.  Based on this time lapse and the other factors, we find that Mr. Laster's statements fall within the requirements of the "excited utterance" exception of W.R.E. 803(2).  We therefore conclude that they were properly admitted into evidence.

## B.     Motion for Judgment of Acquittal on Second Degree Murder Charge

[¶52]  We next address Mr. Bruce's argument that the district court erred in denying his motion for judgment of acquittal on the charge of second degree murder.  We review the denial of a motion for judgment of acquittal using the following standard of review:

> In reviewing the denial of a motion for judgment of acquittal, we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith.
>
> A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime.  Or, stated another way, if there is substantial evidence to sustain a conviction of the crime, the motion should not be granted.  This standard applies whether the supporting evidence is direct or circumstantial.

*Butcher v. State*, 2005 WY 146, ¶ 11, 123 P.3d 543, 548 (Wyo. 2005).

[¶53]  At the close of the State's case, Mr. Bruce moved for a judgment of acquittal, and the district court denied that motion.  Mr. Bruce then presented evidence, including the testimony of four defense witnesses.  At the close of evidence, Mr. Bruce again moved

---

[4] This discussion of the allowable time lapse points to consideration of the declarant's age as a factor that may require consideration where the declarant's age may influence the response to the startling event. Mr. Laster's age in a neutral factor in our analysis.

for a judgment of acquittal, and the district court again denied the motion. The jury then returned a verdict finding Mr. Bruce not guilty of second degree murder but guilty of the lesser included offense of manslaughter. Following the jury verdict, Mr. Bruce filed a written motion for judgment of acquittal challenging the sufficiency of the evidence to support the manslaughter conviction.

[¶54] Based on the foregoing sequence of motions, Mr. Bruce argues that "[t]here is no issue of waiver" with respect to his request that this Court reverse the district court's rulings on his motions for judgment of acquittal on the charge of second degree murder. Based upon our precedent, however, we find this assertion to be overly broad.

[¶55] This Court has repeatedly held that a defendant's introduction of evidence following denial of a judgment of acquittal is a waiver of the appeal of that motion. *Hawes v. State*, 2014 WY 127, ¶ 8, 335 P.3d 1073, 1076 (Wyo. 2014); *Granzer v. State*, 2010 WY 130, ¶ 7, 239 P.3d 640, 643–44 (Wyo. 2010); *Butcher*, ¶ 12, 123 P.3d at 548; *Robinson v. State*, 11 P.3d 361, 368 (Wyo. 2000); *Hodges v. State*, 904 P.2d 334, 339 (Wyo. 1995). We have explained:

> Where a defendant introduces evidence after denial of a motion for judgment of acquittal made at the end of the State's case, he waives that motion, and only a similar motion made after return of the verdict may be claimed as error.

*Butcher*, ¶ 12, 123 P.3d at 548.

[¶56] Mr. Bruce's appeal from the denial of his motion for judgment of acquittal on the second degree murder charge for which he was ultimately acquitted is similar to the appeal we addressed in *Robinson*. In *Robinson*, the defendant was acquitted of the charged offense of first degree murder and the lesser included offense of second degree murder but was convicted of the lesser included offense of manslaughter. *Robinson*, 11 P.3d at 368. The defendant appealed the denial of his motion for judgment of acquittal on the first and second degree murder charges, and this Court addressed the appeal by limiting its review to the sufficiency of the evidence supporting the manslaughter charge on which the defendant was convicted:

> Robinson contends that the trial court's failure to grant his motion for judgment of acquittal on the counts for first and second degree murder gave rise to the additional instruction on voluntary manslaughter for which he was convicted. In reply, the State contends that one cannot appeal the denial of a motion for judgment of acquittal on charges for which the jury ultimately acquits.

W.R.Cr.P. 29 permits motions for judgment of acquittal at the close of evidence by either side and after discharge of the jury. In this case, Robinson made three motions for judgment of acquittal, but it is our rule of law that introducing evidence waives the earlier motion and only the later motion may be claimed as error. *Hodges v. State*, 904 P.2d 334, 339 (Wyo.1995). The motion made after the jury returned its verdict indicates that at the close of all evidence during the jury instruction conference, the State requested and received an instruction on second degree murder and the defense then requested and received an instruction on voluntary manslaughter. Because of his acquittal on first and second degree murder, the last motion was limited to the conviction for voluntary manslaughter. We, therefore, will consider whether the evidence was sufficient to support the conviction for voluntary manslaughter.

*Robinson*, 11 P.3d at 368.

[¶57] We again addressed a similar issue in *Butcher*, where the defendant was acquitted of first degree murder but convicted on the lesser included offense of second degree murder. *Butcher*, ¶ 14, 123 P.3d at 548. In addressing the defendant's appeal from the denial of his motion for judgment of acquittal, we observed:

At the close of the State's case, defense counsel moved for judgment of acquittal on the ground that "the State has not met its burden to show either premeditated malice or malice." The district court denied that motion, and the appellant proceeded to present evidence. Consequently, he has waived his right to challenge that denial on appeal. After trial, however, the appellant renewed his motion for judgment of acquittal, on the same grounds as his earlier motion. Despite the intervening conviction for the lesser-included offense of second-degree murder, the latter motion sought "judgment of acquittal on the single count contained in the information." That motion, like the earlier one, was denied.

This Court must confess a certain amount of confusion as it addresses this issue. The appellant's brief contains nineteen pages of argument in which it is contended that the State did not prove either premeditation or deliberation, and that, therefore, the charge of first-degree murder should not have gone to the jury. Our confusion arises out of the fact

that, by finding the appellant guilty of the lesser-included offense of second-degree murder, the jury had, in effect, acquitted him of the charged offense of first-degree murder. There can be no possible error or prejudice here. Even if the district court had granted the appellant's post-verdict motion for judgment of acquittal on the charge of first-degree murder, that would have had no effect upon the finding of guilt on the lesser-included offense.

*Butcher*, ¶¶ 14-15, 123 P.3d at 548-49 (footnote omitted).

[¶58]  Our decisions in *Robinson* and *Butcher* instruct that there is simply no basis for this Court to review the denial of a motion for judgment of acquittal where a jury has acquitted the defendant on the charge for which the motion was denied. Mr. Bruce attempts to distinguish *Butcher* by arguing the following prejudice from the denial of his motion at the close of evidence:

> This prejudice arises from the fact that the evidence was not sufficient to support the offense charged. Yes, the jury ultimately acquitted him of the more serious offense, but the jury was given the opportunity to consider the lesser included offense (an uncharged offense) when there was not enough evidence to go forward on the charged offense. To deny that prejudice can exist in this circumstance is to chip away or diminish the meaning and purpose of Rule 29, as well as any level of protection it affords to criminal defendants. It is, in a sense, already a great burden for defense counsel to defend against every possible lesser (but uncharged) offense the State may ask to submit to the jury. Defense counsel here aggressively defended against the charge of second degree murder, and the State failed to meet its burden. Mr. Bruce should not then be penalized by the fact that the jury recognized this failure, though the trial court did not. If the State has not met its burden, the ultimate verdict should not affect the relief to which Mr. Bruce was due.

[¶59]  We reject this alleged prejudice as a basis to revisit the district court's denial of Mr. Bruce's motion for judgment of acquittal on the second degree murder charge. First, the argument presumes that a not guilty verdict equates to error in the denial of the motion. This presumption ignores the standard a court must follow in ruling on a motion for judgment of acquittal, which requires it to disregard the defendant's evidence, assume the prosecution's evidence is true, and give that evidence all logical and reasonable

inferences. *See Butcher*, ¶ 11, 123 P.3d at 548. Obviously, a jury does not approach its task with the same constraints.

[¶60] Mr. Bruce's alleged prejudice also strays from the purpose to be served by a motion for judgment of acquittal, which has been described as follows:

> A directed verdict for defendant, however, or judgment for acquittal as it is now called, is an important safeguard to the defendant. It tests the sufficiency of the evidence against defendant, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt.

2A Charles Alan Wright and Peter J. Henning, *Federal Practice and Procedure: Criminal* § 461, at 325 (4th ed. 2009) (footnotes omitted). Here, because the jury acquitted Mr. Bruce of the second degree murder charge, the potential harm the motion was intended to guard against plainly did not come to pass.

[¶61] Finally, Mr. Bruce's argument implies that had the motion for judgment of acquittal been granted on the charged count of second degree murder, the lesser included offense would not have been submitted to the jury. Our decisions in *Butcher* and *Robinson* implicitly recognized that this is not the case. *See Butcher*, ¶ 15, 123 P.3d at 549 ("Even if the district court had granted the appellant's post-verdict motion for judgment of acquittal on the charge of first-degree murder, that would have had no effect upon the finding of guilt on the lesser-included offense."); *Robinson*, 11 P.3d at 368 (considering sufficiency of the evidence on lesser included offense with no consideration given to denied motion for judgment of acquittal on charged offense). We agree with the reasoning of the Tenth Circuit Court of Appeals:

> When ruling on a motion for judgment of acquittal, a district court should consider not only whether the evidence would be sufficient to sustain a conviction of the offense charged, but also whether it would be sufficient to sustain a conviction on a lesser included offense. *See* Fed.R.Crim.P. 31(c) ("The defendant may be found guilty of an offense necessarily included in the offense charged...."); *United States v. Cavanaugh*, 948 F.2d 405, 409 (8th Cir.1991) (holding that if a court grants judgment of acquittal following a jury verdict of guilty, it may enter judgment of conviction on a lesser included offense); 2 Charles Alan Wright, *Federal Practice and Procedure: Criminal 2d* § 467 (2d ed. 1982) ("[O]n a motion for judgment of acquittal the court must consider whether the evidence would be sufficient to sustain a

> conviction of [ ] a lesser offense."). If the evidence is
> sufficient to sustain a conviction on the lesser but not the
> greater offense, the judge may submit only the lesser charge
> to the jury. *See United States v. LoRusso*, 695 F.2d 45, 52 (2d
> Cir.1982).

*United States v. Wood*, 207 F.3d 1222, 1229 (10th Cir. 2000); *see also People v. Scott*, 10 P.3d 686, 688 (Colo. App. 2000) (where trial court grants motion for judgment of acquittal on greater offense, it retains authority to submit lesser included offense to jury); *State v. Morris*, 331 N.W.2d 48, 56 (N.D. 1983) ("A trial court's granting of a motion for judgment of acquittal with respect to the major offense charged does not preclude submission of the case to the jury on the basis of the lesser included offense instruction[.]").[5]

[¶62] For the foregoing reasons, we will not address the district court's denial of Mr. Bruce's motion for judgment of acquittal as it pertains to the second degree murder charge.

## C.    Sufficiency of Evidence to Support Manslaughter Conviction

[¶63] We agree with Mr. Bruce that there is no question of waiver respecting his challenge to the sufficiency of the evidence supporting his manslaughter conviction. We review a sufficiency of the evidence claim as follows:

> We review that evidence with the assumption that the
> evidence of the prevailing party is true, disregard the
> evidence favoring the unsuccessful party, and give the
> prevailing party the benefit of every favorable inference that
> we may reasonably draw from the evidence. We will not
> reweigh the evidence nor will we re-examine the credibility
> of the witnesses.

*Hawes*, ¶ 8, 335 P.3d at 1076 (quoting *Brown v. State*, 2014 WY 104, ¶ 8, 332 P.3d 1168, 1171–72 (Wyo. 2014)).

---

[5] As a final observation, to the extent Mr. Bruce's argument implies that submission of both the second degree murder and manslaughter charges to the jury was unfair because it presented the jury with a compromise it would not have felt compelled to make had the second degree murder charge not been submitted, we rejected such a suggestion in *Butcher*: "Perhaps the appellant is attempting through this argument to hint that this was a compromise verdict, and that he would have preferred a compromise between second-degree murder and manslaughter. There is no legitimacy to such an argument." *Butcher*, ¶ 15, 123 P.3d at 549, n.1.

[¶64] Mr. Bruce was convicted of voluntary manslaughter pursuant to Wyo. Stat. Ann. § 6-2-105(a)(i), which provides that a person is guilty of manslaughter "if he unlawfully kills any human being without malice, expressed or implied, . . . [v]oluntarily, upon a sudden heat of passion[.]" Wyo. Stat. Ann. § 6-2-105(a)(i) (LexisNexis 2013). The district court instructed the jury that "heat of passion" means:

> [S]uch passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection of deliberation, and from passion rather than from judgment. The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

[¶65] Mr. Bruce argues there was insufficient evidence to establish the statutory elements of manslaughter, insufficient evidence to establish his state of mind when he struck Mr. Laster, and "absolutely no evidence whatsoever that Mr. Bruce intended to kill Mr. Laster, or even, for that matter, that he was acting voluntarily as opposed to reflexively." Based on our review of the record, we find the evidence was sufficient to support the jury verdict finding Mr. Bruce guilty of manslaughter.

[¶66] At the outset, we reject the assertions framing Mr. Bruce's state of mind and intent arguments. First, the argument that there is no evidence that Mr. Bruce intended to kill Mr. Laster is not relevant to our review because voluntary manslaughter is "a general intent crime that does not require a deliberate intent to kill." *Noel v. State*, 2014 WY 30, ¶ 35, 319 P.3d 134, 146 (Wyo. 2014) (quoting *State v. Keffer*, 860 P.2d 1118, 1138–39 (Wyo. 1993)). Second, we disagree with Mr. Bruce's suggestion that evidence of his state of mind is necessarily insufficient unless it is direct evidence of state of mind at the moment he struck Mr. Laster. This Court has observed that "in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." *Benjamin v. State*, 2011 WY 147, ¶ 46, 264 P.3d 1, 12 (Wyo. 2011) (quoting *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 843 (Wyo. 1980)). Our consideration of the evidence may therefore include both direct and circumstantial evidence of the statutory elements and Mr. Bruce's state of mind.

[¶67] When we accept the State's evidence as true and give the State every favorable inference that may reasonably be drawn from that evidence, the evidence shows that Mr. Bruce entered Mr. Laster's home, proceeded to the back bedroom, struck Mrs. Laster in

29

the temple with a beer bottle, and thereafter struck Mr. Laster a couple of times with the beer bottle, which blunt force trauma caused Mr. Laster's death from a subdural hematoma. As to Mr. Bruce's state of mind, the State's evidence showed that Mr. Bruce had been upset most of the day because of his concern that the Lasters might be reconciling. The State's evidence also showed that just after the assault, Mr. Bruce contacted Mrs. Laster's daughter, Teri Hughes, and was ranting and hollering. During that encounter, which occurred shortly after the assault, Mr. Bruce told Ms. Hughes: that he was angry when he went to Mr. Laster's home because Mrs. Laster was there; that when he went to the back bedroom in Mr. Laster's home he thought the Lasters were having sex; that he hurt the Lasters because they "fucked him;" and the Lasters got what they deserved.

[¶68] The evidence was sufficient to support a finding that Mr. Bruce voluntarily struck Mr. Laster with a beer bottle, that he struck Mr. Laster in the heat of passion, and that in doing so, he unlawfully killed Mr. Laster. The district court therefore did not err in denying Mr. Laster's motion for judgment of acquittal on the charge of manslaughter.

## D. Denial of Motion for New Trial based on Inadmissible Hearsay

[¶69] Before addressing the substance of Mr. Bruce's argument that the district court erred in denying his motion for a new trial, we must determine the appropriate standard of review. Mr. Bruce filed his new trial motion based upon a prosecution witness' testimony, which the district court struck as inadmissible hearsay. When the offending testimony was given, defense counsel objected and asked that the testimony be stricken, but counsel did not object to the court's curative instruction or move for a mistrial. In moving for a new trial, Mr. Bruce did not assert any particular defect in the court's curative instruction or even reference the instruction and instead generally asserted a new trial was warranted because, although the inadmissible hearsay had been stricken, the damage had been done, and the bell could not be un-rung.

[¶70] In *Mendoza v. State*, 2013 WY 55, 300 P.3d 487 (Wyo. 2013), this Court reviewed the denial of a new trial motion, which motion was based on what the defendant alleged to be an erroneous jury instruction. Because the defendant had not objected to the jury instruction, we held that the district court's denial of the new trial motion would be reviewed for an abuse of discretion, but the alleged underlying error in the jury instruction itself would be subject to our plain error standard of review. *Id.*, ¶¶ 8-9, 300 P.3d at 489-90. Because Mr. Bruce likewise did not object to the district court's curative instruction, we will take the same approach. We shall review the denial of the new trial motion for an abuse of discretion and the adequacy of the district court's curative instruction for plain error.

[¶71] "A district court abuses its discretion when it could not have reasonably concluded as it did." *Mendoza*, ¶ 8, 300 P.3d at 489 (citing *Majors v. State*, 2011 WY 63, ¶ 24, 252

P.3d 435, 441 (Wyo. 2011)). Our plain error analysis requires that an appellant "establish, by reference to the record, a violation of a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way and that the violation adversely affected a substantial right resulting in material prejudice." *Joreski v. State*, 2012 WY 143, ¶ 11, 288 P.3d 413, 416 (Wyo. 2012) (quoting *Jealous v. State*, 2011 WY 171, ¶ 11, 267 P.3d 1101, 1104 (Wyo. 2011)). Material prejudice means a reasonable probability exists that the result would have been more favorable in the absence of the alleged error. *Id.*

[¶72] The testimony that was the basis of Mr. Bruce's new trial motion was testimony given by Teri Hughes, daughter of Mrs. Laster and stepdaughter of Mr. Laster. The testimony, defense objection, and ruling on the defense objection went as follows:

> Q. Did you talk to your dad after he got done speaking to the deputy?
> A. Yes.
> Q. Okay. Did you ask him if he was okay?
> A. Yes.
> Q. And why did you ask him if he was okay?
> A. Because I heard him tell the deputy that Shey hit him with a bottle.
> THE COURT: Just a minute.
> [Defense Counsel]: Well –
> THE COURT: You're on your feet, Counsel. Is there something you want?
> [Defense Counsel]: To the extent that she was – said anything about what her dad told her that the jury heard, I would ask the Court to strike that and object that I don't think counsel asked her a hearsay question, but she was nonresponsive.
> * * * [proceedings outside presence of jury] * * *
> [Defense Counsel]: Thank you, Your Honor. Obviously, the defendant objects to Ms. Hughes testifying what her father told her about the incidents of that evening. And I did not object when [Prosecutor] asked her the question, because I believe he asked her – I can't remember what it was, but I don't think it directly called for hearsay.
> THE COURT: [Reads back testimony] And at that point, I interjected and tried to stop the answer.
> [Defense Counsel]: And thank you for doing that, Your Honor. I was making a note or something at that time and, perhaps, I should've objected before.
> But, so, again, we move to strike whatever she said in response to that, and also on the grounds of hearsay.

31

. . . .

> THE COURT: Well, I have some thoughts about how to deal with it, too. First of all, I'm going to deal with the objection and sustain it. And I'm going to caution – I'm going to strike her testimony as to what her father told her outside, and caution the jury not to consider it. . . .
>
> [Defense Counsel]: Okay. Thank you, Your Honor.

[¶73] The district court thereafter explained the meaning of hearsay to the witness and cautioned her to refrain from providing such testimony and to answer only the question she is asked. The court then instructed the jury:

> . . . The ladies and gentlemen of the jury are back with us. And ladies and gentlemen, just before you were escorted to the jury room, Ms. Hughes was asked a question to the effect of why was she concerned about her father. And her answer – and I'm paraphrasing a bit here – was that she was concerned because she heard her father say to the policeman present that the defendant had hit him with a bottle.
>
> I attempted to stop that testimony, as I think all of us did, because it's hearsay. That is a classic hearsay statement, and it's not admissible. And the Court has sustained the defendant's objection to that testimony. And you are instructed that – specifically that you must disregard that particular testimony.

[¶74] Applying our plain error analysis, we find that the first element of the test is satisfied. Mr. Bruce alleges the district court's jury instruction was inadequate to cure the harm caused by the inadmissible hearsay. The record clearly depicts the hearsay testimony and the curative instruction.

[¶75] The second element of the plain error analysis requires that Mr. Bruce establish a violation of a clear and unequivocal rule, and that the violation be clear and obvious, not merely arguable. Mr. Bruce has not made this showing. "We have said many times that a trial error may be corrected by an appropriate curative instruction, and that we presume that jurors follow the court's instructions." *Willoughby v. State*, 2011 WY 92, ¶ 11, 253 P.3d 157, 161 (Wyo. 2011) (citing *Janpol v. State*, 2008 WY 21, ¶ 24, 178 P.3d 396, 405 (Wyo. 2008); *Brown v. State*, 953 P.2d 1170, 1177 (Wyo. 1998); *Rubio v. State*, 939 P.2d 238, 243 (Wyo. 1997); and *Burke v. State*, 746 P.2d 852, 857 (Wyo. 1987)). Mr. Bruce has provided no basis to deviate from this approach. In particular, he has cited no authority that would establish that the curative instruction in this case was clearly

inadequate, and our precedent is in fact to the contrary. *See Metzger v. State*, 4 P.3d 901 (Wyo. 2000).

[¶76] In *Metzger*, a witness testified to statements the victim made to her concerning the defendant's sexual abuse of the victim. *Id.*, 4 P.3d at 907-08. The trial court sustained hearsay objections to the testimony, struck the testimony, and instructed the jury: "I'd ask the jury to disregard the hearsay statements." *Id.* On appeal, the defendant asserted the curative instruction was inadequate to remedy the harm caused by the testimony. *Id.* at 908. This Court disagreed, explaining:

> Keeping in mind that this was a witness who was nine years old at the time she testified, and the overall context of AG's testimony, we conclude that the witness's hearsay statements were inadvertent and not a deliberate effort by the prosecutor to get the witness to introduce that hearsay into evidence. The trial court immediately corrected the problem by instructing the jury to disregard both of AG's hearsay responses. We must assume that the jury followed the court's curative instruction. *Burke v. State*, 746 P.2d 852, 857 (Wyo.1987). Metzger asks that we rely instead on our holding in *Zabel v. State*, 765 P.2d 357, 363 (Wyo.1988) that curative action cannot take the sting out of every mistake, *i.e.*, we do not always presume that the jury will follow the court's curative instructions. In *Zabel*, we declined to follow our usual rule because an expert's testimony led the jury through a truthfulness evaluation (of a victim under circumstances similar to this case) which ultimately told the jury that the victim was truthful and the defendant was guilty. In this case, AG's stricken statements did tend to corroborate EM's accusations; however, the trial court's remedial action was immediate and comprehensive. Under the circumstances of this case, we opt to follow our general rule that the jury did obey the corrective instructions utilized by the trial court.

*Metzger*, 4 P.3d at 908.

[¶77] Given this precedent, we cannot find plain error in the district court's response to the inadmissible hearsay and its curative instruction. Defense counsel agreed that the hearsay testimony given in this case was not deliberately drawn out by the prosecutor. Additionally, when the witness offered the offending testimony, the district court immediately intervened and then gave the jury a curative instruction that was much more detailed and comprehensive than the instruction upheld in *Metzger*. Because we find no

plain error in the court's curative instruction, we find no abuse of discretion in the court's denial of Mr. Bruce's motion for a new trial.

## E. Failure to Instruct the Jury on Self Defense

[¶78] Mr. Bruce argues that self-defense was part of his defense theory and the district court erred in failing to give the jury a self-defense instruction. "The failure to give an instruction on the law related to a theory of defense is a due process issue, which this Court reviews *de novo*." *Nelson v. State*, 2010 WY 159, ¶ 13, 245 P.3d 282, 285 (Wyo. 2010); *Ewing v. State*, 2007 WY 78, ¶ 7, 157 P.3d 943, 945 (Wyo. 2007).

[¶79] Wyoming law is well settled with respect to instructing a jury on a defendant's theory of the case:

> "[A] defendant has the right to have instructions on his theory of the case or his theory of defense presented to the jury if the instructions sufficiently inform the jury of the theory of defense and if competent evidence exists which supports the law expressed in the instructions." *Thom v. State*, 792 P.2d 192, 195 (Wyo.1990). However, we have also noted that "[n]ot every instruction must be given simply because there is a claim that it incorporates a theory of the case." *Wilkening v. State*, 922 P.2d 1381, 1383 (Wyo.1996). A trial court may properly refuse to give a proposed instruction if it is erroneous, confusing, argumentative, or if the instruction unduly emphasizes one aspect of the case, the law, or the defendant's version of the events. *Madrid v. State*, 910 P.2d 1340, 1346 (Wyo.1996); *Jansen v. State*, 892 P.2d 1131, 1140 (Wyo.1995); *Virgilio v. State*, 834 P.2d 1125, 1128 (Wyo.1992). Additionally, "instructions not based on the evidence can be properly refused." *Chavez-Becerra v. State*, 924 P.2d 63, 67 (Wyo.1996).

*Drennen v. State*, 2013 WY 118, ¶ 20, 311 P.3d 116, 124 (Wyo. 2013) (quoting *Farmer v. State*, 2005 WY 162, ¶ 23, 124 P.3d 699, 707 (Wyo. 2005)).

[¶80] We have also said:

> Any competent evidence is sufficient to establish a defense theory even if it consists only of testimony of the defendant. *Best v. State*, 736 P.2d 739, 745 (Wyo.1987). We view the evidence in a light favorable to the accused and the accused's testimony must be taken as entirely true to determine if the

evidence is competent. *Duckett v. State*, 966 P.2d 941, 944 (Wyo.1998). Even if the court deems the evidence to be weak, or unworthy of belief, the instruction must be given if a jury could reasonably conclude the evidence supports the defendant's position. *Id.*

*Nelson*, ¶ 14, 245 P.3d at 286 (quoting *Iseli v. State*, 2007 WY 102, ¶ 10, 160 P.3d 1133, 1136 (Wyo. 2007)). On the other hand, an instruction is properly refused if it invites the jury to engage in speculation or conjecture. *Young v. State*, 849 P.2d 754, 766 (Wyo. 1993).

[¶81] Mr. Bruce cites the following as evidence that supported giving a self-defense instruction in this case:

> Mr. Laster took four loaded weapons over to Mr. Bruce's just before the altercation, and expressed that he was not going to take an "ass whooping" from a younger man. It was within ten or fifteen minutes of Mr. Laster's return to his trailer from Mr. Bruce's home that Mr. Bruce came over.
>
> When Ms. Hughes picked Mr. Bruce up at the Fast Lane, he was upset, and said Mr. Laster had hit him in the back of the head with a Maglite flashlight. In fact, Ms. Hughes felt the bump on Mr. Bruce's head from the injury through his hair.
>
> Ms. Hughes also testified that Mr. Bruce had bloody knuckles, and that Mr. and Mrs. Laster had "fucked him."

[¶82] We disagree that the above-cited evidence was sufficient to warrant the giving of a self-defense instruction. This Court has held that a person who is the aggressor in an altercation has a duty to retreat before using deadly force:

> Self-defense is one of the rights which the law of necessity gives to man. It is founded and based on necessity-on the inability of the executive machinery of the law to be always with the citizen to protect him from the aggression of others. A right of such a high character must also, of necessity, be attended with high responsibilities; and that is the obligation on the part of one who exercises the right to be the executioner of his fellow man to see that his own conduct is exemplary. Self-defense is a legal right, not an excuse for a homicide, and it can be exercised only where he who employs it is himself in the right at the time or moment of its use. The aggressor-one who strikes another, and thereby brings on a

35

combat, or one who by the use of vile and opprobrious language almost as surely brings on a combat-is not clothed with the right of self-defense, so long as he continues to persist in his own wrongdoing. He must discontinue his own assault, whether by violence or by word, before the law of necessity says that he can strike down his assailant; and whether or not he is required to retreat before resorting to the awful extremity of taking human life, when he is in the right, he certainly must resort to that simple expedient, if it is consistent with his safety, when he is in the wrong.

*Drennan*, ¶ 24, 311 P.3d at 125-26 (quoting *State v. Flory*, 276 P. 458, 462 (Wyo. 1929)).

[¶83] While it is true that the State carries the burden of proving that the defendant did not act in self-defense, we have also held:

A defendant must first present a prima facie case of each element of the affirmative defense before the jury is instructed on the theory, including that the victim acted as the aggressor. Only then does the burden shift to the State to prove that a defendant was not acting in self-defense.

*Brown v. State*, 2014 WY 104, ¶ 16, 332 P.3d 1168, 1174 (Wyo. 2014) (citing *Drennen*, ¶ 39, 311 P.3d at 129).

[¶84] There is no question that when the incident in Mr. Laster's home began, Mr. Bruce was the aggressor. While much of the evidence in this case was hearsay evidence, Mrs. Laster testified to the events she witnessed that initiated the violence at Mr. Laster's home. Mrs. Laster testified that Mr. Bruce entered Mr. Laster's home unbidden, came into to the back bedroom where Mr. and Mrs. Laster were located, talked to some extent with Mr. Laster, and then suddenly struck Mrs. Laster with a beer bottle hard enough to cause her to lose consciousness. Thereafter, the evidence shows that Mr. Bruce struck Mr. Laster a couple of times with a beer bottle, and accepting Mr. Bruce's evidence as true, Mr. Laster struck Mr. Bruce with a Maglite flashlight. As to how those events unfolded, we agree with defense counsel's observation during the instructions conference that "we're guessing about whatever happened in those moments."

[¶85] What is critical here is that the record is entirely devoid of evidence that Mr. Bruce stopped being the aggressor and that Mr. Laster became the aggressor. That is, Mr. Bruce presented no evidence that at some point during the altercation, he attempted to stop his own aggression and withdraw or retreat from the situation. None of the evidence cited by Mr. Bruce addresses this controlling question. Mr. Laster's possession of firearms is not relevant to the inquiry because Mr. Bruce presented no evidence that Mr.

Laster threatened him with the weapons or that Mr. Bruce was even aware of the weapons. Likewise, Mr. Bruce's own injuries, the bloody knuckles and the bump on his head, and his statements that the Lasters "fucked him," reveal nothing concerning who acted as the aggressor during the continuing altercation. In the absence of evidence that Mr. Bruce stopped being the aggressor and Mr. Laster became the aggressor, Mr. Bruce failed to make a prima facie case that would have supported the giving of a self-defense instruction. The self-defense instruction requested by Mr. Bruce would have simply been an invitation to the jury to engage in speculation or conjecture, and the district court thus properly refused to give the instruction.

## CONCLUSION

[¶86]  We find no error in the district court's admission of the deceased victim's 911 call, its rulings on Mr. Bruce's motions for judgment of acquittal, its curative instruction regarding the inadmissible hearsay, or its refusal to instruct the jury on self-defense. Affirmed.